Lila A. MILEY, Plaintiff-Appellee,

v.

OPPENHEIMER & COMPANY, INC., Anthony L. Geller and John W. Hamilton, Defendants-Appellants.

No. 79-2099.

United States Court of Appeals,
Fifth Circuit.
Unit A

Feb. 17, 1981.

Rehearing and Rehearing En Banc
Denied April 1, 1981.

William D. Sims, Jr., William M. Parrish, Dallas, Tex., for defendants-appellants.

Daniel L. Penner, Fort Worth, Tex., for plaintiff-appellee.

Before GOLDBERG, POLITZ and SAM D. JOHNSON, Circuit Judges.

GOLDBERG, Circuit Judge:

For as long as investment brokers have been remunerated on a commission basis, the potential has existed for brokers to excessively trade accounts in an effort to generate fees. Not surprisingly, for almost as long a period of time,[1] civil suits alleging excessive trading or "churning" in violation of the broker's common law fiduciary duty and the federal securities law have dotted the federal docket.

Despite the fact that judges have been composing churning law for over a decade among the outdoor vendors and the pigeons that line Foley Square, New York (the seat of the Second Circuit) and over the rumbling of nearby cable cars in San Francisco (the base of the Ninth Circuit), the Fifth Circuit's only churning composition has been a deafening silence, rivaling the notorious work of John Cage.[2] No panel in this circuit has ever reached the merits of a

---

1. The problem of excessive trading by investment brokers seeking to generate high commissions was first dealt with almost exclusively by the Securities and Exchange Commission. The Commission relied on the general broker-dealer antifraud provisions of the federal securities acts, e.g., Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a) (1964); Securities Exchange Act of 1934, §§ 10(b) and 15(c), 15 U.S.C. §§ 78j(b), 78o(c) (1964), to control such misconduct by brokers. Note, *Churning By Securities Dealers*, 80 Harv.L.Rev. 869 (1969).

2. *See* John Cage, *Four Minutes and Thirty-Three Seconds* (a piano composition dedicated to the proposition that silence is music to the ears.)

churning case.[3] Moreover, while the works of our brethren composers on other circuits have been helpful, they have not been so comprehensive in analysis as to answer many of the complex issues in the area of churning.

In the present case, therefore, Judge Mahon was faced with several difficult questions concerning churning, amidst the pervasive silence of the Fifth Circuit and with but random tunes of intimation and adumbration from other courts. In contesting the jury verdict for the plaintiff Lila Miley, defendants Oppenheimer & Co. and two of its registered representatives, Anthony Geller and John Hamilton, (hereinafter "defendant" or "Oppenheimer") contend that in his attempts to fill such judicial silence, Judge Mahon repeatedly struck errant cords. We have reviewed Judge Mahon's work most carefully and have found it to be well-orchestrated and harmonious. Although Oppenheimer's suggested orchestration of the law governing churning is not without appeal, we have chosen Judge Mahon's work as the superior composition and affirm the decision of the district court.

## I. The Ingredients of a Churning Case: Skimmed Versus Evaporated Milk

 Churning occurs when a securities broker enters into transactions and manages a client's account for the purpose of generating commissions and in disregard of his client's interests. *McNeal v. Paine, Webber, Jackson & Curtis, Inc., supra,* 598 F.2d at 890 n.1 (5th Cir. 1979); *Mihara v. Dean Witter & Co., Inc.,* 619 F.2d 814, 820 (9th Cir. 1980). Once an investor proves

that: (1) the trading in his account was excessive in light of his investment objectives; (2) the broker in question exercised control over the trading in the account; and (3) the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interests, *Mihara v. Dean Witter & Co., Inc., supra,* 619 F.2d at 821; *Rolf v. Blyth, Eastman, Dillon & Company, Inc.,* 424 F.Supp. 1021, 1039–1040 (S.D.N.Y.,1977) *aff'd in part and rev'd in part,* 570 F.2d 38 (2nd Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), the broker may be held liable for a violation of the federal securities laws under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and S.E.C. Rule 10b–5.[4] *McNeal v. Paine, Webber, Jackson & Curtis, Inc., supra,* 598 F.2d at 890 n.1. *See Mihara v. Dean Witter & Co., Inc., supra,* 619 F.2d at 820; *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1206–07 (9th Cir. 1970); *Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1069 (2nd Cir. 1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Carras v. Burns,* 516 F.2d 251, 288 (4th Cir. 1975); *Landry v. Hemphill, Noyes & Co.,* 473 F.2d 365, 368 n.1 (1st Cir.), *cert. denied,* 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). Additionally, upon proving the three requisite elements of a federal securities law churning violation, the investor will, in most or perhaps all cases, be entitled to hold the broker liable under a pendent state claim for breach of fiduciary duty.

The stories presented at trial by the two parties in this case were similar to the

---

**3.** The only Fifth Circuit case to present the issue of churning, *McNeal v. Paine, Webber, Jackson & Curtis, Inc.,* 598 F.2d 888 (5th Cir. 1979), was decided on statute of limitations grounds.

**4.** The Securities & Exchange Commission's Rule 10b–5, promulgated under the general anti-fraud provisions of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme or artifice to defraud;

(2) to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

(3) to engage in any act, practice, or course of business which would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security.

Churning is classified as a "device, scheme or artifice to defraud", and thus, is within the purview of the rule.

contentions of the opposing parties in most churning cases.[5] Miley, like most churning plaintiffs, argued that she was an unsophisticated investor and that Oppenheimer and its brokerage representatives were aware of this fact. Miley contended further that she carefully informed Oppenheimer that the investment in question represented substantially all of her assets and, thus, that her investment objectives were merely conservative income and growth, in order to insure the safety of her principal. As in most churning cases, Miley then had an expert testify that in light of these conservative investment objectives, the transactions in the account were excessive in size and frequency.

Not surprisingly, Oppenheimer presented a very different picture of the broker-client relationship at issue. Like most churning defendants, Oppenheimer argued that their client was a person with substantial income and assets who desired to greatly increase her wealth by risking downside losses. Oppenheimer contended further that Miley stressed her desire for a high rate of return through the clever and aggressive handling of her discretionary account. Again paralleling most churning cases, Oppenheimer then had their experts testify that the transactions in the account were quite reasonable in light of these speculative objectives.

This jury in this case, as in previous similar churning suits, was faced with the difficult task of choosing between these two scenarios. Moreover, it is indeed possible and, perhaps, probable that the truth lay somewhere in between the two conflicting stories. Miley may, in fact, have been somewhat disgruntled at having lost at what was clearly a gambler's game, while Oppenheimer may, in fact, have tended to err on the side of entering into, rather than of passing up, a somewhat risky investment in order to earn the related commissions. Despite the wide disparity in the stories presented by the opposing parties and the resulting difficulty of the jury's task—or, more precisely, because of such disparity and difficulty—the appellate court review of the jury's factual conclusions is quite limited. We may only insure that there is sufficient evidence in the record to support the existence of each of the three requisite elements of a federal securities churning violation (and, in turn, the elements of a breach of fiduciary duty claim).

█ The jury in this case concluded that defendant Oppenheimer had churned plaintiff Miley's account in violation of both the federal securities law and the Texas common law fiduciary duty of investment brokers.[6] Although Oppenheimer strongly protests the jury's finding of liability in this case, we feel that there is sufficient evidence in the record to support finding each of the three requisite elements of a federal securities law churning violation and to support a finding that Oppenheimer breached its Texas common law fiduciary duty.

In addition to contesting the sufficiency of the evidence supporting the finding of liability, defendant Oppenheimer has raised several difficult questions of law concerning the compensatory and punitive damages award, the charge to the jury, and the refusal to order arbitration of the pendent state claims in this case. It is to these challenges that we now turn.

---

**5.** The similarity in the stories which are presented at most churning trials may perhaps be caused primarily by a rationalization process in the minds of honest plaintiffs and defendants, and only secondarily by the hindsight litigation tactics of well-schooled lawyers.

**6.** The jury also found that Oppenheimer violated the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Business and Commerce Code Ann. § 17.46 (Vernon's 1968 & Supp. 1980). However, none of the issues presented on appeal relate to this violation.

Judge Mahon correctly viewed the three violations—the violation of the federal securities law, the breach of fiduciary duty, and the violation of the Texas Deceptive Trade Practices-Consumer Protection Act—as alternative grounds for recovery. He entered judgment only on the breach of fiduciary duty count. However, as will be obvious throughout this opinion, it is necessary to consider the federal securities law concerning churning in order to properly analyze the alleged errors concerning the breach of fiduciary duty caused by such churning.

## II. Compensatory Damages: Crying Over Spilt Milk

In instructing the jury on the elements of the actual damages in this case and by awarding over $54,000 in such damages, Judge Mahon allowed Miley to recover for both the commission and interest paid as a result of the excessive trading and for the decline in the value of her portfolio in excess of the average decline in the stock market during the time in which Oppenheimer handled her account. Oppenheimer argues that allowing recovery for both excess commissions and excess portfolio decline constitutes double recovery and sets an improper floor on damages for breach of fiduciary duty.

■ Once the gravamen of the churning complaint is clearly identified, the argument that awarding both excess commissions and excess portfolio decline constitutes double recovery appears to be without merit. The willful misconduct at the core of a churning complaint is the broker's excessive trading of an account in an effort to amass commissions. While excessive commissions represent the sole source of gain to the broker from his misconduct, there are in fact two distinct harms which may be proximately caused by the broker's churning of an account. It is necessary to remedy both harms in order to fully compensate the victimized investor.

■ First, and perhaps foremost, the investor is harmed by having had to pay the excessive commissions to the broker—the "skimmed milk" of the churning violation. The broker's wrongful collection of commissions generated by the intentional, excessive trading of the account constitutes a compensable violation of both the federal securities laws and the broker's common law fiduciary duty, regardless of whether the investor's portfolio increased or decreased in value as a result of such trading. Second, the investor is harmed by the decline in the value of his portfolio—the "spilt milk" of the churning violation—as a result

of the broker's having intentionally and deceptively concluded transactions, aimed at generating fees, which were unsuitable for the investor. The intentional and deceptive mismanagement of a client's account, resulting in a decline in the value of that portfolio, constitutes a compensable violation of both the federal securities laws and the broker's common law fiduciary duty, regardless of the amount of the commissions paid to the broker. In sum, once a jury finds that the broker has churned an investor's account, it may also find that the investor would have paid less commissions and that his portfolio would have had a greater value had the broker not committed the churning violation.[7] *See* Nichols, *The Broker's Duty to His Customer Under Federal Fiduciary and Suitability Standards,* 26 Buff.L.Rev. 435, 445 (1977) ("Where there is excessive trading in an account ("churning"), the customer can be damaged in many ways. He must pay the brokerage commissions on both purchases and sales, he may miss dividends, incur unnecessary capital gain or ordinary income taxes depending on the holding period, and, most difficult to measure, he may lose the benefits that a well-managed portfolio in long-term holdings might have brought him."); Brodsky, *Measuring Damages in Churning and Suitability Cases,* 6 Sec.Reg. Law J. 157, 159–160 (1978) ("Most often, the customer complains that the broker churned unsuitable securities. Then, both causes of action are appropriate and both damage theories [excess commissions and excess decline in portfolio value] should be considered.")

Defendant Oppenheimer fails to cite a single case in which a court refused to award both excess commissions and excess decline in portfolio value on the ground that such recovery would constitute double compensation. In fact, those courts and authorities which have considered the issue have concluded that, in an attempt to excessively trade an account so as to generate commissions, a broker may enter into unsui-

---

**7.** These two distinct and compensable harms were clearly alleged in Miley's complaint, and there could be little doubt based on the evidence presented at trial that she was seeking redress for both forms of loss.

table transactions, thereby simultaneously damaging the value of the portfolio. *E. g., Mihara v. Dean Witter & Co., supra,* 619 F.2d at 826 (affirming a damage award as properly compensating for both commissions earned through the excessive trading and trading losses resulting from the unsuitable transactions entered into as the result of such trading); *Hecht v. Harris, Upham & Co., supra,* 430 F.2d at 1211 (finding actual damages from churning to be both excess commissions and trading losses, but refusing to grant recovery for trading losses due to waiver and estoppel); *Carras v. Burns, supra,* 516 F.2d at 259; Note, *Churning By Securities Dealers,* 80 Harv.L.Rev. 869, 883–87 (1967); Nichols, *supra* at 445; Brodsky, *supra* at 159–160.

■ Although not briefed by defendant Oppenheimer, it appears that the real problem with compensating the victimized investor for the decline in the value of his portfolio (as well as for the excess commissions) is not the fear of double recovery, but rather, the difficulty in accurately measuring the loss in portfolio value proximately caused by the excessive trading and unsuitable transactions. The task of fully compensating the investor without being unduly speculative at the expense of the broker has never been undertaken by this court, and has plagued and divided other courts which have faced the problem. *See McNeal v. Paine, Webber, Jackson & Curtis, Inc., supra,* 598 F.2d at 894 n. 14 (5th Cir. 1979). It is and has been clear that, in theory, the plaintiff is entitled to recover the difference between what he would have had if the account has been handled legitimately and what he in fact had at the time the violation ended with the transfer of the account to a new broker. However, the nature of the churning offense as well as the inherent uncertainties of the operation of the stock market make exact implementation of this elementary legal theory impossible.[8]

■ Churning is a unified offense: there is no single transaction, or limited, identifiable group of trades, which can be said to constitute churning. Rather, a finding of churning, by the very nature of the offense, can only be based on a hindsight analysis of the entire history of a broker's management of an account and of his pattern of trading that portfolio, in comparison to the needs and desires of an investor. A corollary of the principle that churning is a unified offense—of the notion that no set group of transactions can be specifically identified as "but for" causes of churning—is that there are many "legitimate" ways of handling any given account. Each of the countless legitimate ways to manage every account would yield a different portfolio value. Thus, it is impossible to compute the exact amount of trading losses caused by the churning of an account.

■ However, neither the difficulty of the task nor the guarantee of imprecision in results can be a basis for judicial abdication from the responsibility to set fair and reasonable damages in a case. It is clear that awarding full "out of pocket" recovery —i. e. the difference between the original and final values of Miley's portfolio—would be to assume, in effect, that none of Oppenheimer's transactions were legitimate, and to disregard the ordinary hazards of the stock market. *See* Note, *Churning By Securities Dealers,* 80 Harv.L.Rev. 869, 884 (1969). Such compensation would clearly constitute a windfall for the plaintiff. However, a refusal to grant any compensation for the decline in portfolio value would be to assume, in effect, that all of Oppenheimer's transactions were legitimate and to disregard the jury's finding that the bro-

---

**8.** These uncertainties were identified more fully by one commentator:

> Variables that do not lend themselves to precise calculation of the value of a customer's account had it been properly managed include: (1) the performance of the market generally; (2) the varying performance of certain categories of securities, for example, those involving the steel, automobile, chemical, and electronics industries; (3) the performance of particular companies which may affect the price of their securities against the trend of the market; and (4) the investment goals of the customer guided by the type of stocks suitable for that customer.

Brodsky, *supra* at 158.

ker wrongly concluded unsuitable transactions to the detriment of the investor. *See id.* at 883–84. Such a refusal to grant any compensation for trading losses would clearly constitute a windfall for the defendant.

 As demonstrated above, a refusal by a court to estimate the amount of trading losses caused by the churning of an account could only yield a certain windfall for either the investor or the broker. However, the essence of the judicial power to set damages—the source and maintenance of its legitimacy—is not the power to choose between alternative windfalls, but is rather the duty to attempt to correct existing windfalls. Thus, a court in a churning case must attempt to approximate the trading losses sustained as a result of the broker's misconduct. *See Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1055 (7th Cir. 1974). ("It is now elementary that when precise damage measurements are precluded by wrongful acts, the wrongdoer cannot insist upon exact measurements and the precise tracing of causal lines to an impractical extent; fair approximations are in order."); Brodsky, *supra* at 158–159.[9]

 In order to approximate the trading losses caused by the broker's misconduct, it is necessary to estimate how the investor's portfolio would have fared in the absence of the such misconduct. The trial judge must be afforded significant discretion to choose the indicia by which such estimation is to be made, based primarily on the types of securities comprising the portfolio.[10] However, in the absence of either a specialized portfolio or a showing by either party that a different method is more accurate, it seems that the technique discussed by Judge Oakes in *Rolf v. Blyth, Eastman,*

*Dillon & Co., Inc.,* 570 F.2d 38, 49 (2nd Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) and employed by Judge Mahon in this case is preferable. *See* Brodsky, *supra* at 157. ("Given the recognized difficulty in computing damages in these cases, that [the *Rolf*] formula is a logical approach toward compensating a customer for loss.") This mode of estimation utilizes the average percentage performance in the value of the Dow Jones Industrials or the Standard and Poor's Index during the relevant period as the indicia of how a given portfolio would have performed in the absence of the broker's misconduct.

 In the case at bar, Judge Mahon instructed the jury to compute trading loss damages by finding:

"by a preponderance of the evidence the difference between the amount of plaintiff's original investment and dividends therefrom less any withdrawals received by Mrs. Miley and less the ending value of her account with defendants. This amount is to then be reduced by the average percentage decline in value of the Dow Jones Industrials or the Standard and Poor's Index during the relevant period of time.

Answer in dollars and cents, if any, or none."

In addition, as part of this same instruction Judge Mahon told the jury that they could award "only such damages as will reasonably compensate her for such injury and damage ... You are not permitted to award speculative damages." We feel that this instruction was both correct and sufficient on the issue of trading losses caused by churning.

---

9. We do not foreclose the possibility that in a rare case, and on facts not presented here, it will be impossible to even approximate how much, if any, of the decline in portfolio value was proximately caused by the broker's misconduct. Such a situation might arise with extremely leveraged accounts, *see Carras v. Burns, supra,* 516 F.2d at 259, or where the investor was responsible for a substantial number of the unprofitable transactions, *see Fey v. Walston, supra,* 493 F.2d at 1055.

10. For example, a judge could decide to use a different figure for portfolios consisting of stock in oil companies as opposed to stock of domestic automobile producers, given the unusual performance of such securities for reasons unrelated to the broker's performance of his job. See Brodsky, *supra* at 165–166.

Defendant Oppenheimer also argues that even if it was proper to instruct the jury to award damages for both excess commissions and excess portfolio value decline on the federal securities law claim, it was improper to so instruct the jury on the breach of fiduciary duty claim. Oppenheimer contends that this instruction set an improper floor on the common law claim damages.

It is clear that Judge Mahon could have chosen to confine his instruction on the breach of fiduciary claim to advising the jury to find "the amount which would fairly and reasonably compensate the Plaintiff, Lila Miley, for her damages, if any, proximately caused by defendants' breach of fiduciary duty." However, we do not feel that Judge Mahon was required to limit his instruction in this manner, nor even that such a limitation would have been preferable to the full instruction on the two elements of harm caused by defendant's misconduct. Miley alleged that Oppenheimer breached its fiduciary duty by excessively trading the account and by concluding deals which were unsuitable for her account. Regardless of whether the broker's excessive and unsuitable trading is characterized as a violation of the federal securities laws or as a breach of fiduciary duty, the harms caused by such misconduct are the payment of excessive commissions and the excessive decline in the value of the investor's portfolio. Accordingly, the jury in the present case was merely afforded the opportunity to find that the broker's breach of his fiduciary duty did in fact harm the plaintiff in these two ways. Judge Mahon told the jury to find the amount of excess commissions, if any, earned as a result of the defendant's breach of fiduciary duty. In addition, Judge Mahon repeated the instruction on trading losses, noted above, enabling the jury to reasonably compute the decline in the value of the portfolio, if any, caused by the broker's misconduct. As discussed at length above, although this damage formula is by no means exact, it does attempt to prevent a windfall to either the injured investor or the wrongdoer, regardless of whether the misconduct at issue is viewed as a federal or state law violation. Rather than setting an improper floor on damages for breach of fiduciary duty, Judge Mahon's instruction seems to have set a proper ceiling on damages by preventing the jury from speculating on any other type of harm—i. e. emotional suffering, trading losses due to ordinary market operation—which the jury may have felt (either wrongly or without proof) was caused by Oppenheimer's breach of fiduciary duty. We can only repeat that Judge Mahon's instructions on compensatory damages were not only unobjectionable, but deserving of praise.

### III. *Punitive Damages for Soured Milk: The High Cost of Churning*

Oppenheimer attacks the award of $100,000 punitive damages for breach of fiduciary duty on three grounds. It argues first that punitive damages should not be awarded on a common law pendent claim in cases where the same standard of conduct considered under federal law results in an award of compensatory damages only. Second, Oppenheimer asserts that there is insufficient evidence to support an award of any punitive damages under Texas law. Finally, Oppenheimer argues that the award of $100,000 is excessive.

Seven years ago, this court noted that "it is well established that exemplary damages may be awarded if allowable under state law when a state law violation is joined with a 10b–5 complaint." *Coffee v. Permian Corp.*, 474 F.2d 1040, 1044 (5th Cir.), *cert. denied*, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973) (citing *Young v. Taylor*, 466 F.2d 1329 (10th Cir. 1972) and *Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970)); *see Stowell v. Ted S. Finkle Investment Services, Inc.*, 489 F.Supp. 1209, 1215 (S.D. Fla.1980). Oppenheimer acknowledges the holding of *Coffee* and readily admits that an award of punitive damages is allowable under Texas law under certain circumstances.

However, Oppenheimer argues that we must now reassess and reverse the *Cof-*

*fee* decision in light of the intervening Supreme Court opinion in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Admitting that by its terms the *Hochfelder* opinion is totally unrelated to the issue of punitive damages, Oppenheimer correctly points out that under *Hochfelder*, mere negligence is insufficient to ground recovery under Rule 10b–5. Since intentional, reckless and willful misconduct will support an award of punitive damages under Texas law, *see, e. g., Ware v. Paxton*, 359 S.W.2d 897, 899 (Tex.1962); *Courtesy Pontiac, Inc. v. Ragsdale*, 532 S.W.2d 118, 121 (Tex.Civ.App.—Tyler 1975, writ ref'd n.r.e.), Oppenheimer correctly concludes in its brief that the same conduct which is required by *Hochfelder* before an award of compensatory damages can be made under federal statutory securities law will support an award for punitive damages under state law.

■ Although Oppenheimer's logic and analysis are impeccable, they add absolutely no support to the contention that we must today reverse our decision in *Coffee* and conclude that punitive damages cannot be awarded on state claims pendent to a Rule 10b–5 action. As noted above no issue relating to punitive damages was considered in *Hochfelder*. Nor does there seem to be the slightest inconsistency between the Supreme Court's conclusion that, based on statutory language and legislative history, it appears Congress did not intend to make mere negligence actionable under the federal scheme of securities regulation (which in no way preempts state law) and the determination by the state of Texas to make punitive damages available to those parties who are intentionally, willfully and wantonly harmed by the actions of others. There seems to be no reason to require, as argued by Oppenheimer, that greater misconduct be present than the degree of misconduct needed to award compensatory damages under federal securities law before punitive damages can be awarded under state law. *See*, Comment, *Punitive Damages and the Federal Securities Act: Recovery Via Pendent Jurisdiction*, 47 U. of Miss.L.Rev. 743, 761–2 (1976) (allowing punitive damages on

pendent state claims insures fulfillment of both federal and state interests); Comment, *The Reappearance of Punitive Damages In Private Actions for Securities Fraud*, 5 Tex. Tech. L.Rev. 111, 112 (1973) ("Earlier prohibitions of punitive damages in actions based solely on federal law should not bar the punitive award where it is authorized under state law . . . The award of punitive damages under state law is aimed at punishment and deterrence of highly fraudulent conduct. Effectuation of this policy is justification for the punitive award.")

■ Moreover, this argument advanced by Oppenheimer casts significant doubt on Oppenheimer's second contention regarding the award of punitive damages to Miley— namely, that there is insufficient evidence in the record to support an award of any punitive damages. In support of this claim, Oppenheimer states in its brief "that there was no evidence to take this case out of a standard churning case," and thus, no evidence to support an award of exemplary damages under state law. But, as Oppenheimer correctly noted in its prior argument, the evidence sufficient to support the "standard churning case" actionable under 10b–5 will be sufficient to support an award of punitive damages under Texas law. As noted earlier, one of the three requisite elements of a federal churning case—which we· held to be supported by sufficient evidence in this case—is that the broker acted with the intent to defraud or with the willful and reckless disregard of his client's interests. Such intentional and willful misconduct, aimed at achieving personal gain at the cost of injuring another, will support an award of punitive damages under Texas law. *Dennis v. Dial Finance & Thrift Co.*, 401 S.W.2d 803, 805 (Tex.1966) ("[T]he allowance of exemplary damages in cases of willful and deliberate fraud does not, therefore, do violence to the rule . . . that the act complained of must partake of a wanton and malicious nature."); *Ware v. Paxton*, 359 S.W.2d 897, 898–99 (Tex.1962); *Bennett v. Howard*, 141 Tex. 101, 170 S.W.2d 709, 712 (1943) ("In order that a recovery of exemplary damages may be sustained, the

plaintiff must show, not merely that the defendant could have or ought to have foreseen and prevented the loss or injury of which the plaintiff complains, but that he acted intentionally or willfully, or with a degree of 'gross negligence' which approximates a fixed purpose to bring about the injury of which the plaintiff complains.")

■ In any event, Judge Mahon instructed the jury that before they could award punitive damages they had to find that Oppenheimer's acts and conduct were "maliciously or wantonly, or oppressively done." Although the jury was not required to award punitive damages in this case, there is sufficient evidence to support the requisite finding of some form of malice.

■ The most troublesome challenge to the punitive damage award in this case is Oppenheimer's contention that the amount of $100,000 is excessive. Both parties agree on the relevant test employed in Texas to assess the fairness of a punitive damage award. In determining whether exemplary damages are excessive, Texas courts consider four factors: (1) the degree of outrage produced by the evil, (2) the frequency of the evil, (3) the size of the award needed to deter similar wrongs in the future, and (4) the ratio between exemplary damages and actual damages. *Southwestern Investment Company v. Neeley*, 452 S.W.2d 705, 707 (Tex.1970); *Estate of Arrington v. Fields*, 578 S.W.2d 173, 183 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.).

The problem with applying the four-part test in the present suit is that the cases, relied on by both parties, which have interpreted and provided guidelines for applying that test bear no relation to the case at bar. *See, e. g., Southwest Investment Company v. Neeley*, 455 S.W.2d 785 (Tex.Civ.App.—Ft. Worth, 1970, writ dism. woj); *Burke v. Bean*, 363 S.W.2d 366 (Tex.Civ.App.—Beaumont, 1962); *Lyon v. Wood*, 363 S.W.2d 179 (Tex.Civ.App.—Dallas, 1962); *Lubbock Bail Bond v. Joshua*, 416 S.W.2d 523 (Tex.Civ.App.—Amarillo 1967); *Dial Finance & Thrift Co. v. Dennis*, 403 S.W.2d 847 (Tex.Civ.App.—Amarillo, 1966). In these cases, the compensatory damage awards range from sixty-eight dollars to seven hundred dollars, while the punitive damage awards vary from five hundred dollars to under twelve thousand dollars. The type of misconduct involved in these cases include assault, false imprisonment, wrongful repossession of a car, and "petty" frauds by vendors. Thus, these cases provide no insight by which to assess the fairness of an award of $100,000 punitive damages granted in addition to award of $54,000 compensatory damages for the commission of a sophisticated, intentional business tort by a large company against an investor. In short, churning cannot be compared to a punch in the nose.

■ Despite the lack of guidance provided by the cited Texas caselaw, we are by no means forced to apply the four-part Texas test for assessing the fairness of punitive damage awards to churning cases in a vacuum. Although we do not decide what amount of punitive damages, if any, should be awarded in every intentional, business tort case, we feel that a formula of punitive damages equal to three times compensatory damages is a fairly good standard against which to assess whether a jury abused its discretion. While there is nothing magical about the three-times-compensatory-damages formula, many courts which have weighed the kind of factors which comprise the Texas four-part test in awarding punitive damages for intentional, big business torts have selected that figure. *See, e. g., Palmer Coal & Rock Co. v. Gulf Oil Co.*, 524 F.2d 884, 887 (10th Cir. 1975), *cert. denied*, 424 U.S. 969, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976) (affirming award of $1,500,000 punitive damages in fraud case with $500,000 compensatory damages); *Northern v. McGraw-Edison Co.*, 542 F.2d 1336 (9th Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977) (lowering punitive damages in business fraud case to $35,000 where average compensatory damage was $12,000); *Malandris v. Merrill, Lynch, Pierce, Fenner & Smith*, 447 F.Supp. 543 (D.Co.1977) (awarding $3,000,000 punitive damages in investor fraud case where compensatory damages

$1,030,000). Moreover, we are greatly impressed by one commentator's insightful analysis on this issue:

> Most courts in the past have seen fit, when they find the broker-dealer's hand in the till, to simply request the removal of the offending appendage. And when the till is empty, and the broker-dealer's fingerprints are all that remain where the money once lay, all the courts do is to require the crook to replace the booty. If ever there was a situation where crime pays it is in such circumstances; heads the dishonest broker-dealer wins and tails everyone breaks even. No wonder one commentator saw fit to term the average recovery in churning cases as creating for the broker-dealer a "low risk larceny." ... [T]he only sure way of deterring such conduct in the future is to take the profit away from the wrongdoers and slap on an additional amount as punitive damages: an award equal to treble damages would be fair, reasonable and well within the public interest.

Goldberg, Fraudulent-Dealer Practices, § 6.5 (1978).

We conclude the three times compensatory damage figure is a proper rule-of-thumb by which to assess the excessiveness of a jury's award of punitive damages in a churning case.

Having selected this figure as the proper standard by which to appraise the fairness of the jury's award and in light of our earlier discussion as to the proper components of the compensatory damage award in a churning case, we are faced with the question as to which damages should be tripled in judging the excessiveness of the exemplary damage award. As noted above, the broker's sole source of gain from churning—and the only intended source of gain— is the unjust commissions generated by the excessive trading. Although the broker's misconduct often results in the incidental additional harm of damaging the value of the plaintiff's portfolio, we feel that including unintended and incidental damages in reviewing a punitive damage award would constitute an unjust windfall to the plaintiff and would be inconsistent with the goal and function of punitive damages. Therefore, we feel, under the law of Texas, that an award of punitive damages which is roughly three times as great as the unjust commissions "earned" by a broker in a churning-breach of fiduciary duty case is not excessive. *See also, Mihara v. Dean Witter & Co., Inc., supra,* 619 F.2d at 826 (affirming award of $66,000 punitive damages in a churning case with $24,600 compensatory damages). The jury's award of $100,000 punitive damages in this churning case in which Oppenheimer earned about $31,000 in unlawful commissions was precisely in the three-times-compensatory-damages ballpark and was not an abuse of discretion.

## IV. The Court's Charge: A Tasty Dairy Recipe

Aside from the alleged errors concerning damages, Oppenheimer raises two challenges to Judge Mahon's charge to the jury in this case. Oppenheimer argues first that the charge wrongly included a reference to rules promulgated by the New York Stock Exchange ("NYSE") and National Association of Securities Dealers ("NASD"), and second, that the charge wrongly omitted an inquiry into Miley's investment objectives. Either of these errors, Oppenheimer notes, could have led to an incorrect verdict and is grounds for a new trial.

As has been noted many times in the past by this court, the standard for reviewing a jury charge is not "academic perfection," *Bass v. International Brotherhood of Boilermakers,* 630 F.2d 1058, 1061 (5th Cir. 1980), but rather, whether the instructions to the jury, taken as a whole, gave a misleading impression or inadequate understanding of the law and the issues to be resolved. *Id.* at 1062; *Scheib v. Williams-McWilliams Co., Inc.,* 628 F.2d 509, 511 (5th Cir. 1980); *Delancey v. Motichek Towing Service, Inc.,* 427 F.2d 897 (5th Cir. 1970); *Gordon Mailloux Enterprises, Inc. v. Firemen's Insurance Company,* 366 F.2d 740 (9th Cir. 1966). In the present case, we think Judge Mahon's charge not only gave an adequate understanding and impression

of the law, but it also approached the unnecessary heights of academic perfection.

### A. *Reference to the Know Your Customer Rule and the Suitability Rule*

The federal circuit courts are divided on the very complex question as to whether a private cause of action can be maintained under the Know Your Customer Rule of the NYSE, Rule 405,[11] and under the Suitability Rule of the NASD, Section 2 of Article III.[12] *Compare Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178, 182 (2nd Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966) (no cause of action exists) *with Buttrey v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 142 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969) (cause of action exists). Oppenheimer attempts to project this court into the fray—a rather precarious position, and one in which we currently neither desire nor deserve to be—by arguing that Judge Mahon's instructions in effect created a private cause of action under these rules. We feel that Oppenheimer mischaracterizes Judge Mahon's reference to those rules, and resist its treacherous offer to rule on the existence of such implied causes of action under these two rules.

As noted above, Judge Mahon instructed the jury that before they could find a violation of the federal securities laws they had to find three requisite elements: control, excessive trading, and intentional action. As part of his instruction on the element of excessive trading, Mahon told the jury that they could consider six factors: (1) the nature and objectives of the account; (2) the turnover rate; (3) in-and-out trading; (4) the holding period of the respective securities; (5) the broker's profit; and (6) observance of the Know-Your-Customer and Suitability rules. In addition, Judge Mahon explained each of these six factors for the jury.

Rather than creating a private cause of action for a violation of the NYSE and NASD rules, Judge Mahon merely allowed the jury to consider a violation of such rules as one of six factors in determining whether Miley's account had been excessively traded. A finding of excessive trading was, in turn, merely one of three elements comprising a violation of the federal securities laws. Moreover, these NYSE and NASD rules are excellent tools against which to assess *in part* the reasonableness or excessiveness of a broker's handling of an investor's account. It was both proper and beneficial for Judge Mahon to include a reference to the rules in this charge. *See Mihara v. Dean Witter & Co., Inc., supra*, 619 F.2d at 824 ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and NASD rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.")

### B. *Failure to Ask the Jury About Miley's Investment Objectives and Financial Needs*

In its brief, Oppenheimer correctly notes that "a critical factual issue with regard to

---

11. Rule 405 of the NYSE is commonly referred to as the Know Your Customer Rule. It provides in part:

 "Every member organization is required through a general partner, a principal executive officer or a person or persons designated under the provisions of Rule 342(b)(1) to (1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization. (2) Supervise diligently all accounts handled by registered representatives of the organization . . . ."

 CCH New York Stock Exchange Guide § 2405.

12. Section 2 of Article III of the NASD Manual is commonly referred to as the Suitability Rule. It provides:

 "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

 CCH NASD Manual § 2152.

Mrs. Miley's churning theory [was] the determination of her investment objectives and financial needs." Oppenheimer therefore concludes that it was reversible error for Mahon to refuse to specifically submit that issue to the jury.

 There is no doubt that a judge must clearly and properly instruct the jury with regard to the resolution of key issues in a given case. However, there is no basis for Oppenheimer's apparent assumption that because an issue is important to the outcome of a case, the jury must be instructed to supply a specific answer informing the court how they resolved that one issue. No party is entitled to a special verdict on each of the multi-faceted, multitudinous issues essential to the resolution of a given case. *See*, 5A Moore's Federal Practice § 49.03(1) ("Under [Federal Rule of Procedure] 49(a) the court has complete discretion as to whether a special or general verdict is to be returned. As with other discretionary acts, this should not be reviewable, except, perhaps, for gross abuse, which can rarely be shown.")

In the present case, Oppenheimer was entitled to a charge which was both comprehensible and comprehensive. Judge Mahon delivered one. Recognizing the importance of the issue of Miley's investment objectives to the resolution of this churning case, Judge Mahon defined and discussed that issue five times during his charge.[13] The jury was made fully aware of the role and importance of Miley's investment objectives in the resolution of this case. Having provided a fully and correctly informed jury, Judge Mahon was under no duty to go further.

### V. *Refusal to Order Arbitration: Preserving the Homogenized Milk*

 Oppenheimer's last argument asserts that Judge Mahon erred in refusing to order arbitration of Miley's pendent state law claims. While admitting that Miley's federal securities law claim was not subject to arbitration, *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), Oppenheimer contends that Judge Mahon should have severed the federal claims from the two pendent state claims and: (1) stayed the trial of the federal claim pending the conclusion of the arbitration of the state claims; or (2) allowed both the trial of the federal claim and the arbitration of the state claims to run their natural courses, without entering any stays; or (3) stayed the arbitration of the state claims pending the completion of the trial on the federal claim. We have carefully considered this difficult issue of federal procedure, focusing primarily upon the relationship between the federal and state claims. Although Oppenheimer's argument merits a full analysis of the arbitration issue, we conclude that it does not provide grounds for concluding that the breach of fiduciary duty claims on which judgment was entered in this case should have been submitted to arbitration.[14]

13. Included in these five references was the following discussion of the issue of investment objectives:

> *The Nature and Objectives of the Account.* You are instructed that you must determine whether Mrs. Miley's investment objectives were conservative and oriented to income with preservation of capital as Plaintiff maintained or whether her investment objective was more aggressive as maintained by Defendants. The investment objectives of the customer are an important standard against which to measure excessiveness. A larger number of transactions are generally needed to find excessiveness in respect to a trading account where the purpose is to generate profits from trading than with respect to an investment account where profits are to be derived from dividends and long term capital appreciation. Excessive trading may be established by fewer transactions if the account is of a non-speculative nature. Even a trading account can be churned even though the number of transactions is small. The churning occurs when the broker trades solely to generate commissions without considering whether the trade has been beneficial to the customer.

14. Since judgment was entered only on the breach of fiduciary duty count, we are not faced today with the issue of whether, under the analysis presented below, it was error for Judge Mahon to refuse to sever the pendent state claim for violation of the Texas Deceptive Practices-Consumer Protection Act and to submit that claim to arbitration. We therefore express no opinion on this issue.

We therefore find that the failure to submit this case to arbitration does not require reversal of the judgment.

As part of the process of opening an investment account, Miley signed two standard contracts, a "Client's Option Agreement" and a "Consent to Loan of Securities Agreement." Both contracts contain provisions whereby the investor agrees to arbitrate disputes relating to the account. Pursuant to Section Two of the United States Arbitration Act, 9 U.S.C. § 2 (1970), these arbitration provisions are recognized to be "valid, irrevocable and enforceable." Additionally, a federal court is required to stay the trial of an action that is brought upon issues that are referrable to arbitration. 9 U.S.C. § 3 (1970).

An important judicially-created exception—known as "the doctrine of intertwining"—has been carved out of this statutory pro-arbitration scheme. The leading case in this circuit developing this exception to the mandate that federal courts should enforce arbitration agreements is *Sibley v. Tandy*, 543 F.2d 540 (5th Cir. 1976) *rehearing denied*, 547 F.2d 286, *cert. denied*, 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977). In *Sibley*, Judge Godbold noted that "when it is impractical if not impossible to separate out non-arbitrable from arbitrable contract claims, a court should deny arbitration in order to preserve its exclusive jurisdiction over federal securities act claims." *Id.* at 543. Additionally, the court in *Sibley* noted that arbitration should not be ordered where "[a]n arbitrator making a decision on the common law claims would [be] impelled to review the same facts needed to establish the plaintiff's securities law claim." *Id.*

■ Despite Judge Godbold's reference to the effect that whether two claims are intertwined depends on whether the same *facts* underlie each claim, Oppenheimer argues that the "doctrine of intertwining" requires a refusal to order arbitration only when the legal issues are inseparable. *See, e. g., Lee v. Ply Gem Industries, Inc.*, 593 F.2d 1266, 1274–75 (D.C.Cir.), *cert. denied*, 441 U.S. 967, 99 S.Ct. 2417, 60 L.Ed.2d 1073 (1979); *Greater Continental Corp. v.*

*Schechter*, 422 F.2d 1100, 1103 (2nd Cir. 1970); *Dehart v. Moore*, 424 F.Supp. 55, 57 (S.D.Fla.1976). Oppenheimer's argument continues by noting that since Miley's case was presented and instituted on "three separate and distinct causes of action" her claims are not "legally intertwined." Although Oppenheimer is correct to the extent that it contends that the mere identity of the evidentiary facts underlying the federal and pendent state claims in a case is not proper grounds for refusing to submit the state claims to arbitration, we feel that Oppenheimer's narrow conception of "legal intertwining" misconstrues both the meaning and purpose of the intertwining doctrine, and the basic import of *Sibley*.

■ The "doctrine of intertwining" was formulated as an exception to the requirement that arbitrable claims be referred to arbitration in order to preserve the exclusive jurisdiction of the federal courts in areas where such exclusivity exists. *See, Sibley v. Tandy, supra*, 543 F.2d at 542–43; *Shapiro v. Jaslow*, 320 F.Supp. 598, 600 (S.D.N.Y.1970). The *Wilko* doctrine, for example, requiring that federal securities claims must be adjudicated in federal court could be rendered totally meaningless if an arbitrator could, *in effect*, resolve the merits of a federal securities claim during the course of arbitrating pendent state claims.

■ The common identity of the evidentiary facts underlying the federal and state claims does not, in itself, present a threat that the federal claim will be in effect resolved during the arbitration of the state claim. In fact, in order for a state claim to be properly pendent to a federal claim, the evidentiary facts underlying the two claims must be largely identical. Refusing to order arbitration whenever such evidentiary facts are intertwined would mean that pendent state claims would almost never be submitted to arbitration, and would largely undermine the clear mandate of the United States Arbitration Act.

However, when the same factual (and legal) conclusions must be drawn from the common evidentiary facts in order to re-

solve the federal and pendent state claims—when the same "ultimate facts" underlie each claim—a threat is posed to the exclusive federal jurisdiction. A federal forum is charged with the sole responsibility and is correlatively granted the sole right to decide the ultimate issues essential to a federal securities claim, based on its own appraisal of the evidence. Allowing an arbitrator to make the primary appraisal of the evidence and to reach the primary conclusions on the issues central to the resolution of the case presents a threat of binding the federal forum through collateral estoppel, *Sennett v. Oppenheimer & Co.*, 502 F.Supp. 939, 1979–1980 CCH Fed.Sec.L.Rep. § 97,378 (N.D.Ill.1980); *Greater Continental Corp. v. Schechter, supra*, 422 F.2d at 1130, and, at the very least, forces the federal court to reach its findings in the light of prior conclusions by the arbitrators on the very same issues.

In a churning case like the one at bar, an arbitrator passing on the breach of fiduciary duty claim, either while the federal trial is stayed or simultaneously with the trial on the federal securities claim, could essentially rob the federal court of its exclusive jurisdiction. An arbitrator's judgment, for example, that a fiduciary duty existed between the investment company and the client but that there was no breach of duty because the account was managed properly and in the best interests of the clients, would completely resolve the disputed issues at the core of the federal case. It is worth repeating that the ultimate issues in a federal securities churning case—(1) whether an account was excessively traded in light of the objectives of the investor; (2) whether the investment company controlled the account; and (3) whether the excessive trading was willfully and recklessly undertaken—must be decided for the first time by the federal forum and not by an arbitrator ruling on pendent state claims. Therefore, it was not error for Judge Mahon to refuse to stay the federal trial or to allow the federal trial and the arbitration to proceed simultaneously.

Oppenheimer has raised on appeal [15] one possible scenario which would preserve the exclusive federal jurisdiction by allowing the federal trial to proceed while the arbitration of the state claim was stayed. Their contention is not without merit; and indeed, there is a strong argument in favor of requiring the judge in a churning case, upon the motion of either party, to instruct the jury that if they do not find a violation of the federal securities laws, they should not reach the issue of whether a breach of fiduciary duty was committed. In such cases, the parties have a right, if they so desire, to have an arbitrator decide whether there was sufficient misconduct to violate the fiduciary duty standard, even though the misconduct did not constitute "willful and reckless excessive trading of an account designed to generate fees."

However, in cases—like the present one—in which the jury does find a violation of the federal securities laws, we do not think it proper to submit the pendent claims to arbitration. The plaintiff has suffered a single legal wrong, for which there are several alternative routes of recovery. A judgment can be entered only upon one of the alternative grounds.[16] *Siedman v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 465 F.Supp. 1233, 1239 (S.D.N.Y.1979). Although a jury would have already concluded that the broker violated federal law to the detriment of the investor, the investor could be forced to endure a long and protracted arbitration procedure before his judgment could be entered and collected.

---

**15.** Although it is not central to our decision today, we note that Oppenheimer never moved in the district court to have the pendent state claims severed and to stay the arbitration pending the completion of the federal trial. Rather, Oppenheimer moved only to dismiss the federal claim or, alternatively to stay the federal trial until completion of the arbitration.

**16.** For example, although the jury in the present case found that Oppenheimer had violated the federal securities laws, the common law fiduciary duty, and the Texas Deceptive Practices-Consumer Protection Act, Judge Mahon entered judgment only on the common law count.

In all likelihood, the plaintiff would choose not to pursue his state claims and to collect his judgment upon conclusion of his federal trial, thereby effectively undercutting the very purpose of pendent jurisdiction. Moreover, in the case where a federal court has already found a willful and reckless mismanagement of the client's account for the broker's personal gain and in disregard of the investor's objectives, it makes no sense to submit the case to a new forum to resolve the breach of fiduciary duty issue. The misconduct which is a prerequisite of a federal securities law violation will, in almost all cases (and certainly under Texas law), satisfy the standard for finding a breach of fiduciary duty. Therefore, in the present case, once the jury had concluded that Oppenheimer had violated the federal securities laws by its handling of Miley's account, there was no error in allowing the jury to pass on the pendent breach of fiduciary duty claim.[17]

### VI. Conclusion: Grade A Pasteurized and Homogenized

The cows were still out to pasture as of the time Judge Mahon was called on to conduct the trial in this churning case. Despite the presence of numerous issues of first impression, Judge Mahon presented a fair and complete charge to the jury and steered the litigation along a proper path. Finding no error in the proceeding below, the judgment of the district court is

AFFIRMED.

---

17. Oppenheimer raises three additional arguments on appeal. It contends first that Judge Mahon erred in admitting evidence that Mr. Geller, the registered representative principally handling Miley's account, had been discharged as a result of customer complaints of unauthorized trading. Second, Oppenheimer contends that Judge Mahon erred in admitting the testimony of Joseph Watson to the effect that the Miley account had been churned. Finally Oppenheimer argues that Judge Mahon should have instructed the jury that a fiduciary relationship did not exist until after her account was opened, and that no such duty existed at the time of its representation inducing Miley to open the account.

We find no merit in any of these three arguments. Based on a review of the record, we feel that Judge Mahon's decision to admit the two challenged pieces of evidence did not represent an abuse of discretion. See, *Richardson v. McChung*, 559 F.2d 395, 396 (5th Cir. 1977). Additionally, the instruction on the existence of a fiduciary was clear, comprehensive and correct.