**ROYSTER COMPANY, a Virginia Corporation, Plaintiff-Appellee, Cross-Appellant,**

v.

**UNION CARBIDE CORPORATION, a New York Corporation, Defendant-Appellant, Cross-Appellee.**

No. 83–3405.

United States Court of Appeals, Eleventh Circuit.

July 26, 1984.

Edward C. Adkins, Tampa, Fla., William Krohley, Kelley, Drye & Warren, New York City, for defendant-appellant, cross-appellee.

Guy R. Friddell III, Norfolk, Va., Julian Clarkson, Tampa, Fla., for plaintiff-appellee, cross-appellant.

Before KRAVITCH and HATCHETT, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

Union Carbide Corporation ("Carbide") appeals from a substantial judgment, following a non-jury trial in this diversity breach of contract action.

The case commenced in June 1977 by Royster against Williams Brothers Waste Control and its affiliates ("Williams"). Carbide was joined as a defendant in January 1979. A non-jury trial commenced on April 13, 1981, after extensive discovery. After two weeks of trial, Williams settled for $1,250,000. The trial proceeded with regard to issues between Royster and Carbide. It lasted 37 days and produced 7,404 pages of testimony and 547 trial exhibits.

On June 2, 1982, the district court entered a 77 page order finding Carbide liable for $4,286,629 for breach of contract. On February 4, 1983 the district court, having for the first time considered the Williams settlement, reduced Royster's recovery against Carbide by the amount of that settlement, and entered a judgment against Carbide for $3,036,629 plus prejudgment interest from June 2, 1982, the date of its first order.

The essential facts, largely undisputed, may be stated briefly as follows. Royster owns and operates a phosphate manufacturing plant. The plant's products are used as fertilizer. To produce phosphate, one must first make sulphuric acid, a process which historically emitted large quantities of sulphur dioxide ($SO_2$) into the atmosphere. In 1970, state and federal law imposed limitations upon those emissions.

In its effort to comply with those requirements, Royster entered into separate but simultaneous contracts with Carbide and Williams on June 14, 1974. These were, of course, both written contracts. Carbide was to provide its "process design" for an $SO_2$ abatement system (known as a PuraSiv S System) and Williams was to produce an "auxiliary" or working, mechanical design and build the facility as an adjunct to Royster's sulphuric acid plant. Actual construction began in January 1975, but because of numerous delays, the system was not completed until January 1976. Even after the "startup," however, the system experienced a number of failures and was not brought "on line" until the end of May 1977. Additional difficulties occurred and plagued the unit until it was completely abandoned and replaced by another system in September 1978. Whenever the PuraSiv S Unit was "down" during that period it was also necessary to cease operating the sulphuric acid plant. The major difficulties of which Royster complained in its action were: 1) the excessive corrosion and breakdown of some of the internal components of the system caused by an accumulation of $NO_x$ (oxides of nitrogen) in the circulating sulphuric acid; 2) other breakdowns in a piece of equipment known as the B-1 blower; and 3) a forced reduction in the production rate of the sulphuric acid plant due to the inability of the PuraSiv S Unit to accommodate the effect of the recycled $SO_2$ on the acid plant tailgas.

The appellant, without seriously disputing the existence of the defects and the ultimate failure of the system, responds that under the contract with Royster, it had no responsibility with respect to these matters. Further, it contends that if it did, there was a maximum amount for which it would be liable in the event of a complete

failure of the system, which amount was greatly exceeded in the damages awarded by the trial court. Carbide also complains of the elements of damage awarded and the inclusion of prejudgment interest for a period of some seven months between the time the court announced the total amount of damages to which Royster was entitled and the final judgment by which the trial court required that Royster's damages be reduced by the amount of its settlement with Williams Brothers.

## I. STATEMENT OF THE ISSUES

As stated by appellant, the issues which it presents are as follows:

1. Did the district court misconstrue Union Carbide's agreement with Royster and thereby impose duties upon Union Carbide which went far beyond its contractual undertakings?

2. Did the district court err by not enforcing the express limitations on liability contained in the agreement, limiting Union Carbide's maximum liability to the contract price of $327,500?

3. Did the district court err by not applying well-established doctrines of avoidable consequences and proximate causation in assessing damages against Union Carbide?

4. Did the district court misapply Florida law in awarding damages for lost profits?

5. Did the district court err in awarding as damages the capitalized cost of the PuraSiv S Unit, less depreciation, as shown on Royster's books at the time it was abandoned?

6. Did the district court err in awarding consequential damages absent proof that such damages were the ordinary consequence of any breach of contract or contemplated by the parties at the time they entered into the agreement?

7. Did the district court err in awarding prejudgment interest to Royster?

8. Did the district court err by not enforcing the Absorbent Supply Agreement under which Royster owed Union Carbide $185,000 plus sales tax and interest thereon?

## II. DISCUSSION

Under its heading "Statement of the Standards and Scope of Review," the appellant states that the issues numbered 1, 2, 3, 7, and 8 present claims that the district court committed legal error in construing the parties' agreement and in failing to apply correct principles of law in assessing Royster's damages. Considering the issues numbered 1, 2, and 3, therefore, it is clear that the appellant does not contest the findings of the trial court that specifically and elaborately set out numerous defects that appeared in the system, once it was installed. We, therefore, turn immediately to the written contract. The trial court based substantially all of its findings of facts as to the alleged breaches of contract on Sections 4(a) and 4(c) of the contract, which was in the form of a licensing agreement between Carbide and Royster. These two provisions read as follows:

(a) Licensee has provided Union Carbide in writing, a project definition for the PuraSiv S Unit which Union Carbide acknowledges to be in sufficient detail to permit Union Carbide to provide a PuraSiv S Process Design for the purpose of Licensee's Contractor preparing an Auxiliary Design and proposal to Licensee. Union Carbide has furnished to Licensee's Contractor, Williams Brothers Waste Control, Inc., the PuraSiv S Process Design for Licensee's plant together with such information as is necessary, in Union Carbide's judgment, for Licensee's Contractor to properly prepare the Auxiliary Design and the Operating Procedures Manual. Such PuraSiv S Process Design is identified by the signatures of authorized representatives of Union Carbide and Williams Brothers Waste Control, Inc., marked as Exhibit A, attached hereto and made a part hereof.... (emphasis added.)

(c) If requested in writing by Licensee, Union Carbide shall review the Auxiliary Design ... for the PuraSiv S Unit and in such event as a part of its engineering services will furnish Licensee with comments pertaining to the conformity of the Auxiliary Design ... to meet the PuraSiv S Process Design. Comments regarding the Auxiliary Design will be furnished within thirty (30) days after receipt of the Auxiliary Design ... Union Carbide by furnishing such comments takes no responsibility for the Auxiliary Design ... The incorporation or failure to incorporate such comments by Licensee or Licensee's Contractor shall not relieve Union Carbide of its express warranty under paragraph 14.[1]

■ As is obvious from the face of Section (a), the contract dealt with two designs. One was identified as PuraSiv S Process Design, a copy of which was attached to the contract. The other was the Auxiliary Design which, according to the terms of the contract, was to be prepared by licensee's contractor, Williams. The trial court construed the contract as providing for the furnishing by Carbide of the Process Design for Royster's plant "together with such information as is necessary, in Union Carbide's judgment, for licensee's contractor to properly prepare the Auxiliary Design and the Operating Procedures Manual." (emphasis added.)

The gist of Royster's complaint was that Carbide failed to furnish sufficient information to Williams to meet the requirements of the "together with" provision of the contract. Appellant takes the almost frivolous position that Section 4(a) required nothing more of Carbide than to prepare and supply to Royster the PuraSiv Process Design. As the trial court pointed out repeatedly during the trial, such construction would eliminate from the contract all of the underscored language quoted above.

The trial court then, based on extensive testimony of expert and other witnesses, found that Carbide had breached the contract (a) "by failing to furnish the Auxiliary Designer with information about $NO_x$ which the Auxiliary Designer needed to properly prepare the Auxiliary Design;" (b) "by failing to inform the Auxiliary Designer that a high efficiency mist eliminator would be required upstream of the B–101 blower, or that, absent reduction of the acid mist in the tailgas, special materials of construction would be necessary for the B–101 blower;" and (c) "By supplying specifications for the adsorber section of the PuraSiv S System of inadequate size and capacity to accommodate the recycled $SO_2$."

Construing the contract under the laws of the State of New York, as the contract provides, we conclude that a "reasonable man" could find on the evidence presented here that the information that was not produced by Carbide was "necessary ... for licensee's contractor to properly prepare the Auxiliary Design in the Operating Procedures Manual." Appellant argues, without citation of authority, that the language permitted Carbide to exercise its own good faith judgment as to the necessity for furnishing information necessary for Williams to properly prepare the Auxiliary Design. To the contrary, appellee points to specific New York authority which clearly establishes the rule that "provisions in agreements calling for performance to the satisfaction of a party fall into two categories. In contracts relating to operative fitness, utility or marketability the provision 'is construed as a matter of law as imposing only the requisite of satisfying a reasonable man' (3 Williston Contracts, § 675a, p. 1946 [rev. ed.])." *Fursmidt v. Hotel Abbey Holding Corp.*, 10 A.D.2d 447, 200 N.Y.S.2d 256 (1960), *reh. denied*, 11 A.D.2d 649, 203 N.Y.S.2d 1012 (1960). *See also Loengard v. Metal & Thermit Corp.*, 204 F.Supp. 74 (S.D.N.Y.1962), where, in construing the New York law, the court said: "A determination of whether a given act is detrimental to a corporation is susceptible to objective tests and accordingly an objective standard should be applied to the contract," citing *Dr. Pepper Bottling Co. v.*

---

1. The excisions from this paragraph are irrelevant to the issues we face.

*Dr. Pepper,* 202 F.2d 372, 377 (5th Cir. 1953).

The trial court specifically quoted the language of Section 4(a) "in Union Carbide's judgment," in its findings of fact. It found, as to each 4(a) breach either that Carbide had had the knowledge that should have caused it to act or that Carbide "knew or should have known" that a particular piece of equipment would have been more suitable than that used in the Auxiliary Design. We conclude that the court satisfied the "reasonable man" standard in finding the breaches of contract for failure to comply with the furnishing of information requirements of Section 4(a).

Similarly, with respect to paragraph (c) of the contract, the trial court made the following findings of fact: ·

(a) Carbide breached Paragraph 4(c) of the Contract by failing to inform Royster that the Auxiliary Designer had selected materials of construction which would not properly contain the sulfuric acid with the concentrations of $NO_x$ which would occur within the PuraSiv system.

and

(b) Carbide breached Paragraph 4(c) of the Contract by failing to inform Royster that the Auxiliary Designer had selected materials and methods of construction which would not withstand the service demanded of the B–101 Blower.

With respect to the 4(c) violations, the trial court made the following observation: Paragraph 4(c) of the contract provides that, *"If requested in writing* by [Royster], Union Carbide shall review the Auxiliary Design [defined by Paragraph 1(d) to include all information necessary to design and construct a PuraSiv S Unit] and in such event as a part of its engineering services will furnish [Royster] with comments pertaining to the conformity of the Auxiliary Design and the Operating Procedures Manual to meet the PuraSiv S Process Design." While some of Royster's various letters transmitting these drawings (Ex. 4035.1, 4035.2, 4035.4, 4035.6, 4035.8) did not expressly ask for review and comment by Union Carbide, using those words (Compare Ex. 4035.9 and 4035.12), that was the plain import and purpose of the correspondence and, as such, the letters clearly satisfied the contractual requirement of a written request. It is also clear that Union Carbide understood at the time that their review and comment was being solicited (LL–70 through 72, Brady); and, in fact, comment was occasionally made (See Ex. 4035.11, 4035.13 and 4035.14). Neither has there been any suggestion or argument in Union Carbide's post-trial memoranda that Royster's method of submitting the Williams Brothers drawings and other mechanical design information was insufficient to trigger Carbide's obligations under Paragraph 4(c) of the Contract.

One of the principal complaints made by Carbide on this appeal is that the provision of Paragraph 4(c) requiring it "to review the Auxiliary Design and as a part of its engineering services to furnish licensee with comments pertaining to the conformity of the Auxiliary Design ... to meet the PuraSiv S Process Design" was modified and limited by Paragraph 7, which stated:

7. *Conformance to PuraSiv S Process Design.* In making any review hereunder of drawings, data, definitions or specifications, Union Carbide assumes no responsibility that Licensee or any of Licensee's contractors, if any, have conformed in construction or installation of a PuraSiv S Unit to PuraSiv S Process Design. Union Carbide assumes no responsibility that the equipment actually purchased by or built by Licensee or Licensee's contractor meets the specifications of the PuraSiv S Process Design. Union Carbide has no responsibility or obligation with respect to Auxiliary Design. In making the aforementioned review, if Union Carbide observes anything which in its opinion is inconsistent with a PuraSiv S Process Design or should be done differently than in the manner proposed by such suppliers and/or subcontractors, Union Carbide shall so notify Licensee in writing. ·Nothing contained

in this paragraph 7 or the procedures set forth herein shall in any way limit, qualify, or modify Union Carbide's warranty set forth in paragraph 14.

In brief, appellant contends that the sentence "Union Carbide has no responsibility or obligation with respect to Auxiliary Design" negatives the provision of Paragraph 4(c) by which Carbide agreed to "furnish Licensee with Comments pertaining to the Conformity of the Auxiliary Design." We agree with the trial court that the language of Paragraph 7 simply absolves Carbide from any responsibility with respect to the drafting or preparation of the Auxiliary Design. It did not absolve Carbide from the obligations specifically imposed by paragraph 4(c). In fact, it appears that Paragraph 7 made somewhat more specific than Paragraph 4(c), the obligations of Carbide. Such obligation would expand it from notifying the licensee if Carbide observed anything which in its opinion was inconsistent with PuraSiv S Process Design to an obligation to notify Royster if in its opinion something "should be done differently than in the manner proposed by such supplier and/or subcontractors."

■ As to the contention that the Paragraph 14 limitation in the amount of $327,-500 upon Carbide's liability in the event of a breach of warranty applied, it is only necessary to note the following paragraph of Section 14(a): "The rights and remedies of Licensee as set forth in this Agreement are exclusive and are in lieu of all other rights and remedies provided by law, *except in the event Union Carbide fails to perform an obligation specifically set forth herein.*" (emphasis supplied.) The obligations which the trial court found violated were "specifically set forth" in paragraphs 4(a) and (c).

In sum, we conclude that the trial court correctly interpreted the purpose and intent of the contract and that the several breaches found by it did occur.

**III. DAMAGES**

The complainant sought and the court granted elements of damages under four categories. These were: (1) The Presence, Accumulation, And Effect of $NO_x$ In The Circulating Acid; (2) The Difficulties With The B–101 Blower; (3) The Unanticipated Effect Of The Recycled $SO_2$ Upon The Royster Sulphuric Acid Plant And Tailgas; and (4) The Cost Of Replacing The PuraSiv S Unit.

Following carefully detailed findings of fact with respect to the underpinnings of its finding of damages with respect to each element, the court made the following summary:

*Summary*

1. The claims attributable to $NO_x$
   - (a) Cost of repairs — $237,966
   - (b) Purchase of sulfuric acid — 217,583
   - (c) Purchase of fuel for auxiliary boiler — 104,873
   - (d) Lost profit on DAP and ROP — 332,747

   $ 893,169

2. The claims attributable to the B–101 Blower
   - (a) Cost of repairs — $ 32,072
   - (b) Purchase of sulfuric acid — 251,751
   - (c) Purchase of fuel for auxiliary boiler — 180,792
   - (d) Lost profit on DAP and ROP — 419,843

   $ 884,458

3. The claim attributable to the recycled $SO_2$
   - (a) Purchase of sulfuric acid — $ 383,062

4. The claim attributable to replacement of the PuraSiv S Unit
   - (a) The net, capitalized cost of the PuraSiv — $2,115,940

   TOTAL — $4,286,629[2]

The only attack made by Carbide on the court's findings of damages which we consider requires our analysis is that dealing

---

**2.** The item shown under Summary 1(d) and 2(d) referring to lost profit on DAP and ROP has reference to two of the final products which were regularly sold on the open market by Royster.

with the element of lost profits totalling some $750,000 under items 1(d) and 2(d), *supra.* As to the element of lost profits, both parties rely upon the same Florida decisions and the decisions of this Court construing the Florida law as outlining the test to be applied by a trial court in ascertaining whether lost profits may be recovered in a breach of contract action. We consider *Aldon Industries, Inc. v. Don Myers & Associates, Inc.,* 517 F.2d 188 (5th Cir.1975), a case cited by the appellants, as fully and most accurately setting out the Florida law in this area:

> ... Whether damages are speculative must be determined by inquiry into both causation of the damage and measurement of damages. The term "speculative" is basically a characterization of the evidence introduced to prove the damages. 5 A. Corbin, *Corbin on Contracts* § 1022 (1964). Proof must show with reasonable .certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's wrongful conduct. *Twyman v. Roell,* 1936, 123 Fla. 2, 166 So. 215. Once the causal connection has been demonstrated, although the impossibility of calculation with "absolute exactness" will not defeat recovery, *McCall v. Sherbill,* Fla.1953, 68 So.2d 362, 364, the amount of damages must be capable of proof to a reasonable certainty and not left to speculation or conjecture. *Travelers Indemnity Co. v. Peacock Construction Co.,* 5th Cir.1970, 423 F.2d 1153, 1157; *New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.,* 1935, 122 Fla. 718, 166 So. 856, 860; *Kenco Chemical & Manufacturing Co., Inc. v. Railey,* Fla.App.1973, 286 So.2d 272, 274....

517 F.2d at 191.

■ The trial court here found that the "down" time of the Royster plant directly resulted in a loss of production of sulphuric acid which was needed in its manufacturing process; that sulphuric acid was bought on the open market by Royster at a price higher than it would have cost Royster to have produced it had the plant been in operation; that there was a constant growing and steady market for the end product; that Royster was required to cut back on shipments already contracted by it to be sold overseas; and that it could have sold its entire production at a price which was in excess of the cost of production. We have carefully checked the record references as to the testimony upon which the trial court based these findings of fact and find that it supports the court's findings. No Florida case has been cited to us by appellant in which the proof of an existing market and the ability to manufacture and deliver the product at a profit was present in which recovery for lost profits was denied.

Nor do we have any doubt as to the correctness of the trial court's implied determination that such damages as occurred were the natural and proximate result of the breaches of contract by Carbide.

The court made its findings of fact and conclusions of law on June 2, 1982. These findings established the damages it found that Royster had sustained. The court then, for the first time, examined the terms of the settlement between Royster and Williams, in order, as it stated, to determine whether and to what extent Royster's recovery should be modified. The final judgment, which gave full credit to Carbide in the amount of the Williams settlement, was entered on February 3, 1983. In the final judgment, the trial court allowed interest between these two dates. Carbide complains that such allowance was contrary to the Florida rule, pertaining to prejudgment interest.

■ In a diversity case we follow the state law governing the award of interest. *Plantation Key Developers v. Colonial Mortgage Co.,* 589 F.2d 164 (5th Cir.1979). What the Florida law is on prejudgment interest is far from clear. In fact, it is impossible to reconcile this court's decisions and those of the Fifth Circuit prior to the division of the Circuit.[3] The latest case

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the court adopted as

in this Circuit which we have found dealing with prejudgment interest under Florida law states: "Florida follows the traditional rule of allowing prejudgment interest where a claim is liquidated, but not where a claim is unliquidated." *Cavic v. Grand Bahama Development Co.*, 701 F.2d 879, 888 (11th Cir.1983)." As recently as 1980, the Court of Appeals for the Fifth Circuit stated in a Florida case:

> Under Florida law, a party may recover prejudgment interest as damages for breach of contract, but where the contractual damages are unliquidated, as here, prejudgment interest is an element of damages that must be ascertained by the jury. *See Plantation Key Developers v. Colonial Mortgage Co.*, 589 F.2d 164, 170 (5th Cir.1979).

*Geyer v. Vargas Productions, Inc.*, 627 F.2d 732, 736 (1980).

Reference to *Plantation Key Developers* brings to light the following language:

> Under Florida law, a party may recover pre-judgment interest on damages for breach of contract. *Shoup v. Waits*, 91 Fla. 378, 107 So. 769 (1926); *Vacation Prizes, Inc. v. City National Bank of Miami Beach*, 227 So.2d 352 (Fla. 2d D.C.A.1969). However, the Florida Supreme Court has stated with respect to actions for unliquidated damages:
>
> > Although interest upon the amount found to be due by the jury, from the due date to the date of the verdict, is allowable as an element of damage, like all other elements of damage it must be ascertained by the jury and assessed in the verdict. In an action of this nature, there being no reference to interest in the verdict, there is no authority, in entering up the judgment thereon, to add to the sum assessed by the jury as damages an additional sum for interest thereon.
>
> 107 So. at 770. This rule of law is firmly established in Florida jurisprudence. (Citation omitted).

binding precedent all of the decisions of the former Fifth Circuit handed down prior to the

*Plantation Key Developers v. Colonial Mortgage Co.*, 589 F.2d 164, 170 (5th Cir. 1979).

It becomes apparent that some of the apparent conflicts in the Florida cases arise from the fact that the courts there have held as to unliquidated amounts that in cases of contract they are to be determined by a jury but in negligence cases, they are not to be recovered at all. Moreover, as a recent Florida case has held:

> With respect to the Florida rule on entitlement to prejudgment interest in actions *ex contractu*, this Court has recently had occasion to cite with approval a decision of the United States District Court for the Middle District of Tennessee in *Tampa Electric Company v. Nashville Coal Company*, 214 F.Supp. 647 (M.D.Tenn.1963). In that case, the federal court concluded that Florida follows the traditional rule of allowing prejudgment interest where a claim is liquidated, but not where a claim is unliquidated. The court pointed out, however, that in Florida, as in other jurisdictions, the distinction between liquidated and unliquidated damages has been substantially blurred insofar as the allowance of interest is concerned....

*Town of Longboat Key v. Carl E. Widell & Son*, 362 So.2d 719, 723–23 (Fla.App. 1978) (footnotes omitted).

■ It thus seems that it is appropriate for us to consider the question of liquidation *vel non* rather than to attempt to resolve the apparent conflict between *Cavic* and *Geyer*. In this case, the trial court found the amount of damages to have been liquidated when it made the definitive findings as to the amount of damages to which Royster was entitled and that the delay for the purpose of permitting the court to ascertain how much credit should be allowed to Carbide by reason of the settlement between Royster and Williams Brothers did not prevent the amount from being liquidated as of the date of the filing of its findings of fact and conclusions of law. In

close of business on September 30, 1981. *Id.* at 1209.

light of the Florida court's recognition of the vagueness of the line between what is and is not liquidated, we are inclined to follow the judgment of the district court and conclude that at least in an action *ex contractu* where the total amount of the damages is finally determined, the amount is liquidated for the purpose of permitting interest to accrue thereafter.

■ In addition to the contract we have previously discussed, Royster and Carbide entered into an agreement that Carbide was to furnish the adsorbent materials necessary to operate the PuraSiv Unit. This contract called for an annual payment of $185,000 by Royster to Carbide. Two of the payments had been completed before the abandonment of the system. When the suit was filed, Carbide counterclaimed for this payment of $185,000. The trial court held that the contract had been fully frustrated, in that the adsorbent materials would be totally worthless to Royster and denied the counterclaim. We find no fault with this determination of this issue.

■ Royster cross-appeals on two issues. The first of these is that the trial court erred in crediting Carbide with the full amount of the $1,250,000 settlement Royster had effected with Williams Brothers. The trial court found that for it not to have allowed this credit, Royster would have recovered twice for the same injury. We conclude that on the totality of the circumstances present, this determination by the trial court was not in error.

■ The remaining ground of Royster's cross-appeal is the failure of the trial court to allow interest on the elements of damage from the time the injury occurred until the date of the trial court's findings of fact and conclusions of law.

For the reasons we have stated above in connection with the Florida law with respect to prejudgment interest, we accept the trial court's determination that these claims were so unliquidated as to be not allowable. Certainly substantial evidence was required, not only to ascertain whether the amounts were due, but also as to the exact amount of the damages to be recovered.

The judgment is AFFIRMED both on appeal and on cross-appeal.