767 F.2d 1498
 Blue Sky L. Rep. P 72,283, Fed. Sec. L. Rep. P 92,247
Phillip M. ARCENEAUX and Barbara J. Arceneaux, Plaintiffs-Appellees.
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., C. Richard
Hill, and Don M. Ribaudo, Defendants-Appellants,
 No. 84-3636.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 12, 1985.
 
 David G. Hanlon, Tampa, Fla., for defendants-appellants.
 Robert Dyer, Orlando, Fla., for plaintiffs-appellees.
 Appeal from the United States District Court for the Middle District of Florida.
 Before RONEY and FAY, Circuit Judges, and DUMBAULD*, District judge.
 FAY, Circuit Judge:
 
 
 1
 Appellants challenge on appeal the jury verdict and certain rulings by the district court, 595 F.Supp. 171, in this "churning" suit, alleging violations of federal and state securities laws, breach of fiduciary duty and gross negligence. Specifically, appellants contend that the jury's verdict in favor of the plaintiffs was not supported by substantial evidence, the jury's rejection of appellants' affirmative defenses was not supported by substantial evidence, the punitive damages awards were excessive, the trial court erred in awarding attorney's fees to plaintiffs, and the trial court erred in adding pre-judgment interest to the damages award. We affirm.
 
 I. FACTUAL BACKGROUND
 
 2
 On March 2, 1983, plaintiffs Phillip Arceneaux and his wife Barbara Arceneaux ("Arceneaux") filed this action in the United States District Court for the Middle District of Florida. Arceneaux alleged both federal and state claims arising from the handling of Arceneaux's securities accounts by defendants. Specifically, plaintiffs alleged that the defendants, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), broker Don M. Ribaudo ("Ribaudo") and the Clearwater office manager C. Richard Hill, engaged in excessive trading or "churning" in plaintiffs' securities account. Plaintiffs sought both compensatory and punitive damages.
 
 
 3
 On May 2, 1984, the jury returned a verdict on all counts in favor of the plaintiffs. The jury awarded $46,675 in compensatory damages against Merrill Lynch, Ribaudo and Hill, $15,000 in punitive damages against Ribaudo, and $300,000 in punitive damages against Merrill Lynch. Defendants filed post-trial motions for judgment n.o.v., for a new trial or for remittitur, all of which were denied. On June 14, 1984, plaintiffs filed a motion for prejudgment interest, and on June 19, 1984, a petition for attorneys' fees pursuant to Fla.Stat.Ann. Sec. 517.211(6) (West Supp.1985). On August 20, 1984, the district court entered an order awarding prejudgment interest in the amount of $11,686.37 and attorneys' fees in the amount of $54,320.
 
 
 4
 In October of 1980, Arceneaux opened a securities account with the Clearwater office of Merrill Lynch, after attending an investment seminar hosted by defendant Ribaudo and Joseph Granville, a prominent investment analyst. Arceneaux graduated from Louisiana State University with a B.S. degree in Mechanical Engineering in 1954. Beginning in 1970, Arceneaux was employed by Walter Kidde & Co. as a regional sales manager. Prior to opening his account with the Clearwater office of Merrill Lynch, Arceneaux had had some investment experience. He opened his first account in Dallas with Merrill Lynch in 1977. After a few months, Arceneaux became interested in options trading and signed an options information sheet which indicated that his investment objective was "trading profits." After moving to Mobile, Alabama, he opened an options account also with Merrill Lynch. In 1980, Arceneaux moved to Clearwater and opened an account with William Provinse in the Merrill Lynch office there. After hearing broker Ribaudo at the investment seminar, Arceneaux decided to open a securities account with him also at Merrill Lynch.
 
 
 5
 When he opened his account with Ribaudo, Arceneaux signed an options information sheet, stating that his investment objective was trading profits. He also signed an options agreement which, by plaintiffs' own admission, clearly warned of the risks inherent in trading options. Arceneaux' recollection of the initial meeting between Ribaudo and himself presents a different picture as to how informed Arceneaux was as to the risks involved. Arceneaux testified that Ribaudo did not discuss any risks with plaintiffs and Arceneaux did not ask him any questions "from a risk standpoint." (R.Vol. 5 at 46-7).
 
 
 6
 The history of Arceneaux's investment account with Merrill Lynch reflects numerous purchases and sales and substantial reliance on Ribaudo's recommendations. In October, 1980, the first month of trading, Arceneaux' account sustained a loss of $2,281.00. In November, however, the account had made a profit of $24,000.00. A month later, the value of Arceneaux' holdings dropped from $77,000 to $44,000. Arceneaux continued to trade, but the value of his account continued to decline. By June 1, 1982, when Arceneaux closed his account, he was left with a net loss of $45,697.00. Ribaudo had earned $11,179.00 in commissions in the fifteen months that he managed Arceneaux' account.
 
 
 7
 Plaintiffs' expert, Mr. Landauer, testified that the average monthly equity in Arceneaux' account turned over eight times on an annualized basis and that the account was turned over ten times during the fifteen months. He also testified that the Arceneaux' financial status was not suitable for the option trading program that was undertaken. In addition, he testified that the velocity of the trading in Arceneaux' account made no sense and noted that "25 percent of the original starting capital ended up in commission to Mr. Ribaudo." (R.Vol. 8 at 98-99).
 
 
 8
 The defendants elicited testimony from Arceneaux that he was aware of the volume of trading in his account and had received confirmation slips. Arceneaux also testified that he was in frequent contact with Ribaudo. On cross examination, plaintiffs' expert testified that if a broker were trying to maximize his commissions, he would not allow numerous options to expire, as Ribaudo did.
 
 II. THE LAW
 
 9
 A. Judgment N.O.V.
 
 
 10
 Appellants contend that the jury's verdict in favor of the plaintiffs was not supported by substantial evidence and was against the great weight of the evidence. We disagree. This was a classic jury case, where the jury was presented with two conflicting versions of the transactions between plaintiff and defendant, and was forced to choose between them. On review, "[w]e may only insure that there is sufficient evidence in the record to support the existence of each of the three requisite elements of a federal securities churning violation...." Miley v. Oppenheimer & Co., 637 F.2d 318, 325 (5th Cir. Unit A 1981).
 
 
 11
 "Churning occurs when a securities broker buys and sells securities for a customer's account, without regard to the customer's investment interests, for the purpose of generating commissions." Thompson v. Smith Barney, Harris Upham & Co., 709 F.2d 1413, 1416 (11th Cir.1983). The plaintiff must prove three elements in order to establish a cause of action for churning: " '(1) the trading in his account was excessive in light of his investment objectives; (2) the broker in question exercised control over the trading in the account; and (3) the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interest.' " Id. at 1416-417 (quoting Miley, 637 F.2d at 324.
 
 
 12
 Both Arceneaux and his expert Mr. Landauer presented sufficient evidence to support each of the three elements of plaintiffs' churning claim. There is no doubt that the evidence conflicted as to each of these elements; however, the jury chose to believe plaintiffs' version of the story. We agree with the district court that "that choice cannot be disturbed by the trial judge." (R.Vol. 2 at 416). As we have recently noted:
 
 
 13
 When a jury is assembled to decide issues of fact they also decide credibility questions. The most traditional role performed by a jury is determining the weight to be given to each witness' testimony.... When the resolution of the case boils down to credibility, the trial judge must allow the jury to function. In this case, the usual deference to the factfinder on issues of credibility requires us to defer to the jury....
 
 
 14
 Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1558 (11th Cir.1984).
 
 
 15
 On the issue of excessive trading, appellants assert that trading in a securities account can not be excessive if it is consistent with the investor's investment objectives. See Landry v. Hemphill, Noyes & Co., 473 F.2d 365 (1st Cir.), cert. denied, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973). Appellants point to the fact that Arceneaux had traded heavily in options in the past and was aware of the volume of trading in his account with Ribaudo. That may be, but plaintiffs' expert testified that the trading in the account was excessive, regardless of the investment objective, and the jury chose to believe him. We will not disturb that credibility choice. Moreover, plaintiffs' expert testified that plaintiffs' account had turned over eight times on an annualized basis. The courts which have addressed this issue have indicated that an annual turnover rate in excess of six reflects excessive trading. See Mihara v. Dean Witter & Co., 619 F.2d 814, 821 (9th Cir.1980); Rush v. Oppenheimer & Co., 592 F.Supp. 1108, 1112 (S.D.N.Y.), modified on other grounds, 596 F.Supp. 1529 (S.D.N.Y.1984). We believe that, at the very least, there was sufficient evidence for the jury to find excessive trading.
 
 
 16
 With regard to the second element of control, appellants focus on their contention that Arceneaux "was a well-educated and experienced options trader who had sufficient financial acumen to determine his own best interests." (Appellants' Opening Brief at 28-29). Appellants also note that Arceneaux was in frequent contact with his broker. Plaintiffs' expert, however, noted that "there was a wide departure from what Mr. Arceneaux was trading prior to meeting Mr. Ribaudo." (R.Vol. 8 at 88-89). Though Arceneaux apparently discussed his account frequently with Ribaudo, the jury could have concluded from Arceneaux' testimony that he was somewhat intimidated by his broker and reluctant to make suggestions or contradict any suggestions that Ribaudo made.
 
 
 17
 With regard to the third element of churning, scienter, appellants point to the fact that plaintiffs' expert stated on cross-examination that if a broker were trying to churn an account, he would not have allowed numerous options to expire. However, plaintiffs' expert also testified that the velocity of trading in plaintiffs' account made no sense, other than to generate commissions. The jury simply believed plaintiffs' expert's version of the reason why there was so much activity in plaintiffs' account. We conclude, therefore, that there was sufficient evidence for the jury to find the existence of all three elements of plaintiffs' churning claim. See Miley, 637 F.2d at 325.
 
 B. Affirmative Defenses
 
 18
 Appellants contend that the jury's rejection of their affirmative defenses was not supported by substantial evidence. As we discussed in Part A, the jury's rejection of these defenses merely reflected a credibility choice in favor of plaintiffs. We see no reason to disturb that choice on appeal.
 
 C. Punitive Damages
 
 19
 Appellant Ribaudo contends that the punitive damages awards were excessive, based on sympathy, passion or prejudice, and contrary to the great weight of the evidence. Specifically, Ribaudo points to the magnitude of the award as measured against the evidence of his net worth in support of his claim of excessiveness. Appellant Merrill Lynch asserts that the punitive damages award against it was "tainted" by the excessiveness of the award against Ribaudo. Since we conclude that the award against Ribaudo was not so excessive as to overturn the jury's decision, the award against Merrill Lynch must be affirmed.
 
 
 20
 The only evidence before the jury regarding Ribaudo's net worth was his own testimony that he had a net worth of $30,000. He did not proffer any documentary evidence revealing his financial status. Merrill Lynch did not present any evidence as to its net worth.[1]
 
 
 21
 In Florida, it is within the jury's discretion whether or not to award punitive damages and to determine the amount which should be awarded. Wackenhut Corp. v. Canty, 359 So.2d 430, 436 (Fla.1978). Therefore, "courts will hold punitive damages excessive only in unusual circumstances." Id. The Supreme Court of Florida has discussed this "settled rule" in the following terms:
 
 
 22
 [A] trial judge may not substitute its [sic] judgment for that of the jury on the matter of damages and may enter an order of remittitur or new trial only when the record affirmatively shows the jury's verdict to be excessive or when the judge makes specific findings concluding that the jury was influenced by something outside the record.
 
 
 23
 Arab Termite and Pest Control v. Jenkins, 409 So.2d 1039, 1041 (Fla.1982).
 
 
 24
 Nothing in the record shows us that the verdict is excessive. We realize that punitive damages should not be so out of proportion to the defendant's net worth that it destroys him. Id. at 1043. However, in this case, defendant Ribaudo chose not to present any evidence, other than his bare assertions, as to his net worth; he is now stuck with that choice. We note that Ribaudo also testified that his income for the past three years had been between $80,000 and $105,000. We agree with the district court that "the jury, having no evidence before it other than Mr. Ribaudo's testimony, could well have found not credible that a person whose income was in the $90,000 per year range had a net worth of only $30,000." (R.Vol. 2 at 417). Similarly, there is nothing in the record to support an alteration of the jury's conclusions regarding the punitive damages assessed against Merrill Lynch. Therefore, the punitive damages award is affirmed.
 
 D. Attorney's Fees
 
 25
 There is no dispute over the question of whether plaintiffs are statutorily entitled to attorney's fees. The Florida Securities Act provides:
 
 
 26
 In any action brought under this section, including an appeal, the court shall award reasonable attorneys' fees to the prevailing party unless the court finds the award of such fees would be unjust.
 
 
 27
 Fla.Stat.Ann. Sec. 517.211(6) (West Supp.1985). Appellants do not contest the applicability of this statute to the instant facts; rather, they contend that the district court lacked jurisdiction to enter an order granting attorney's fees because plaintiffs-appellees' motion was untimely. Final judgment was entered on May 2, 1984, and plaintiffs filed their motion for attorney's fees on June 19, 1984. Appellants argue that the award of fees constituted an alteration or amendment of the judgment, which is barred under Fed.R.Civ.P. 59(e), because the motion was not made within ten days of entry of the judgment. We disagree.
 
 
 28
 We agree with the district court that White v. New Hampshire Department of Employment Security, 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), is instructive. In White, the Supreme Court held that a motion for attorney's fees under 42 U.S.C. Sec. 1988 raised issues collateral to the main action, and therefore the time constraints of Rule 59(e) did not apply. Like Sec. 1988, Sec. 517.211(6) provides for an award of fees to the "prevailing party." Obviously, the request can not be made until it is determined who is the prevailing party.
 
 
 29
 On this issue, the former Fifth Circuit has stated that:
 
 
 30
 [A] motion for attorney's fees is unlike a motion to alter or amend a judgment. It does not imply a change in the judgment, but merely seeks what is due because of the judgment. It is, therefore, not governed by the provisions of Rule 59(e).
 
 
 31
 Knighton v. Watkins, 616 F.2d 795, 797 (5th Cir.1980). Moreover, this court has recently held "that requests for attorneys' fees may be made by motion within a reasonable period of time after the final judgment in a case." Gordon v. Heimann, 715 F.2d 531, 539 (11th Cir.1983) (footnote omitted). Our research has not revealed any Florida cases which address this issue of timeliness of a motion for attorney's fees under Sec. 517.211(6). We therefore conclude that the motion in the instant case was made within a reasonable time, and that the court's decision of entitlement to fees is collateral to the decision on the merits and therefore the inquiry can not begin until it is ascertained which party has prevailed. See White, 455 U.S. at 451-52, 102 S.Ct. at 1166-67. See Gordon, 715 F.2d at 537 (motion for attorney's fees did not require the court to reconsider decision on the merits to determine if correct).
 
 E. Prejudgment Interest
 
 32
 Appellants also challenge the district court's award of prejudgment interest on the ground that Florida law precludes the award of such interest on unliquidated claims. We have recently examined Florida law on this issue and noted that "[w]hat the Florida law is on prejudgment interest is far from clear." Royster Co. v. Union Carbide Corp., 737 F.2d 941, 948 (11th Cir.1984). After noting the difficulty of ascertaining the line between what is and what is not liquidated, the court in Royster stated that it was "inclined to follow the judgment of the district court," id. at 950, and we will do the same. We note that the jury awarded, in its entirety, plaintiffs' total claimed loss. Therefore, the jury did not really resolve any dispute as to the amount of the claimed loss. This appears to us to be in the nature of a liquidated claim. We therefore affirm the award of prejudgment interest.
 
 
 33
 AFFIRMED.
 
 
 
 *
 Honorable Edward Dumbauld, U.S. District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Merrill Lynch also chose not to present any evidence regarding its net worth. We will not speculate why counsel chose this strategy, but our analysis of Ribaudo's claim is apposite. Without any evidence before it, the jury was entitled to assume that a $300,000 verdict against Merrill Lynch would not destroy that company economically