**M & B CONTRACTING CORPORA-TION, a Michigan corporation, Plaintiff-Appellant,**

v.

**David DALE and Merrill Lynch, Pierce, Fenner & Smith, Inc., a subsidiary of Merrill Lynch & Co., Inc., a Delaware corporation, jointly and severally, Defendants-Appellees.**

No. 84–1871.

United States Court of Appeals, Sixth Circuit.

Argued April 18, 1986.

Decided July 17, 1986.

Robert S. Krause, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., Robert Kinchen (argued), for plaintiff-appellant.

Douglas G. Graham, Lead Counsel (argued), Butzel, Keidan, Simon, Myers & Graham, Detroit, Mich., Dennis K. Egan, for defendants-appellees.

Before LIVELY, Chief Judge and MERRITT and JONES, Circuit Judges.

LIVELY, Chief Judge.

In this case the plaintiff, M & B Contracting Corporation (M & B), sought damages from Merrill Lynch and its registered representative, David Dale, for alleged violations of federal securities laws. More specifically, the complaint charged Merrill Lynch and Dale with "intentional misrepresentations, omissions, acts, practices and course of dealing [which] constitute violations of § 17(a) of the Securities Act, § 10(b) of the Exchange Act and Rules 10b–5 and 10b–16 promulgated thereunder ... as well as other statutes, rules and regulations relating to the securities industry." Following a bench trial the district court entered a judgment in favor of Merrill Lynch.

I.

M & B is a successful Michigan corporation engaged in road building and other construction work. Prior to May 1980 M & B had kept most of its working capital invested in certificates of deposit. Both its chairman, Sebastian J. Mancuso, and its vice-president of finance, Peter Saputo, became interested in an investment plan that would yield more income while providing greater liquidity. Saputo had become acquainted with David Dale, and at Dale's suggestion M & B opened a Ready Assets trust, a money market account, with Merrill Lynch. In the beginning M & B deposited approximately $1.6 million of its $3 million in excess funds into Ready Assets. Shortly thereafter, on Dale's advice, M & B began buying utility bonds and stocks, and eventually began trading in large blocks of common stocks. In September 1980 M & B executed an Option Trading and Margin Agreement with Merrill Lynch. Much of the trading after that time was conducted on margin. From June to December 1980 M & B made frequent trades in 10,000-share lots of a large number of different stocks, often holding stocks for just a few days. Throughout 1980 this practice was profitable: M & B realized a gain of $482,-000 in those six months.

The stock market turned down in early 1981 and M & B began experiencing losses. According to Merrill Lynch witnesses, Dale, Saputo and the Merrill Lynch branch manager had a conversation in January 1981 in which M & B was cautioned about the risk of margin trading in M & B's account. Nevertheless, the pattern of 1980 continued throughout 1981, with many high-volume, short-term trades being made on margin. The continuing weakness of the market produced margin calls that eventually forced M & B to liquidate its

holdings at substantial losses. The account with Merrill Lynch was finally closed in July 1982 with M & B suffering losses that totalled more than $2 million.

## II.

The district court, 601 F.Supp. 1106, filed a memorandum opinion containing extensive findings of fact. On appeal M & B contends that the findings on two aspects of its claim are clearly erroneous. The district court found that Dale did not "churn" the M & B account, that is, engage in transactions without regard for M & B's investment interests for the purpose of generating commissions. The district court also found that Dale did not make material misrepresentations or fail to advise M & B of information material to its investment decisions.

## A.

■ Churning consists of three elements, all of which must be present: (1) the trading must be excessive in light of the customer's investment objectives; (2) the broker must exercise control over the account; (3) the broker must act with intent to defraud or with willful and reckless disregard of the customer's interests. *Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 767 F.2d 1498, 1501 (11th Cir. 1985). The critical finding in this case related to the element of control. After reviewing the backgrounds of the parties and the course of their business relationship, the district court stated:

> Crucial to decision is the testimony of Dale and Saputo. There is no question that, over all, Dale was extremely evasive and tried so hard to put his testimony in the best possible light that he lost much of his credibility. There is also no question that Dale was anxious to keep the account moving, and that he encouraged much of the trading. His testimony did not help the defendant. M & B was Dale's best customer, and it is obvious that he was trying to make as many trades as he could to gain commissions. By the same token, Dale was

impressed with Saputo's knowledge and experience, and spoke truthfully of his impression of Saputo as a capable, informed businessman with a very successful company. At one point, he stated that Saputo was probably the best informed client in the office.

> It is clear to the Court that Saputo was most responsible for what happened here. As chief financial officer, he had an obligation to watch the investments like a hawk, and there is no question but that he did. The Court does not find his testimony credible when he says that he placed his complete trust in Dale and simply went along with Dale's recommendations without any independent inquiry. Nor does the Court accept his protestations of ignorance about the market and his total reliance upon Dale's recommendations. Saputo maintained extremely careful records, and had an extensive background in business. He was careful and conscientious in all of his financial duties with M & B. The records he kept of the sales and purchases were extremely detailed, and they enabled him to determine, at any given moment, the exact condition of the account. He was a CPA with extensive experience in business. Every trade made by Dale was approved by Saputo, and he generally did not approve transactions until he had obtained the approval of Senior [Mancuso].

> It is significant that he felt the reasons given him by Dale for each and every transaction made sense. It is clear that Saputo was in control of the account since he made an independent evaluation of each recommendation. He testified at one point that when M & B moved out of the ready asset account and into common stocks it was an exciting time because the market was moving up. He kept meticulous records, talked with Senior almost daily about the activity of the account, and was very involved in and informed about the account from the start.

His protestations that he did not thoroughly understand margin accounts and option trading are not credible. He may not have been an expert in the market, but he knew enough to know that trading on margin and in options was very risky. It is undisputed that he understood the concept of margin trading, and he must have realized that by the time margin trading began M & B's account had come a long way from the conservative liquid investment account he testified had been M & B's initial investment objective.

In fact, Saputo's entire testimony about M & B's investment objectives is hard to believe. He claims that its initial goal was a safe, readily available liquid investment that would earn a respectable and consistent return, and he claims that objective never really changed. This is refuted completely by the facts. M & B went into a pattern of short term, roller coaster, in-and-out, margin and option trading that was about as far from a safe, readily available liquid investment as possible. There is little question that he knew exactly what he was doing. This is borne out by months of careful record keeping and reports to stockholders, hundreds of conversations between him and Dale, and almost daily conversations between him and Senior.

\* \* \* \* \* \*

It is clear to the Court that M & B, through Saputo and Senior, maintained control over this account. Saputo was a sophisticated businessman and a CPA, well acquainted with financial matters. Senior had become a tremendously successful builder, graduating, as he said, from the "school of hard knocks." M & B's officers were not naive regarding financial matters. In addition, the relationship between M & B and Dale was one of strictly business. Saputo and Senior viewed the relationship as a professional one, and there is no question that Saputo and Dale dealt on an arms-length basis. Dale did not take advantage of Saputo because of their former relation-

ship on the softball team. Nor was there usurpation of control by Dale, since he always had M & B's prior approval. Finally, there was regular consultation between the parties as to the trades. At no time was a trade made without consultation.

(Footnote omitted).

Though the district court dwelt primarily on control, it also found specifically that there was no excessive trading in light of the customer's objectives and that the proof failed to show a reckless disregard for M & B's interests or that Dale sought to defraud M & B. The district court found that M & B's investment goals changed radically sometime after the relationship with Merrill Lynch began, but that Saputo and Mancuso understood at all times the risks they were taking. The district court found that the conversation to which Dale testified took place on January 19, 1981, involving Dale, Saputo and Russell Mann, the branch manager of the Merrill Lynch office where Dale was employed. During this conversation Mann "reviewed the status of the account, including the margin debt, the equity and losses, and ... whether M & B could afford the risk of its positions." The district court also found that at the same meeting the parties discussed whether M & B wanted to make any trading changes.

### B.

The district court made brief findings with respect to the claim of fraudulent misrepresentations:

To establish a case for fraud by a broker-dealer under Section 10(b) and [Rule 10b–5] thereunder, it is necessary that the defendant implement a deceptive or manipulative practice in connection with the [purchase] or sale of a security. *See Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017 (6th Cir.1979). To establish a fraud claim in this case, it would be necessary to show that Dale made material misrepresentations or nondisclosures to M & B in connection with the purchase or sale of a security, that

they were either made with the intention of defrauding M & B or were made recklessly, that M & B relied on these misrepresentations, and that they were the proximate cause of damages.

The proofs in this case simply do not show such misrepresentations. There were no material misrepresentations, or non-disclosures by Dale to plaintiff. Saputo was fully informed about everything that went on in the account; Saputo had full access to the research work of Merrill Lynch; Saputo discussed extensively every transaction with Dale, and to suggest that somehow or other Dale defrauded Saputo and Senior is without any foundation in the record.

### III.

■ M & B contends that the district court relied on selective portions of the testimony to support its finding that the account was not churned. However, a reading of all the testimony discloses clear support for the district court's findings on this issue. Dale did not make a single purchase or sale without prior approval from Saputo. Saputo was a certified public accountant with substantial business experience. He read extensively about the stock market and conversed daily with Dale. While it is clear that Saputo and Mancuso were impressed with Dale's knowledge of the market, there is no evidence that they ever surrendered control of the account to the broker.

In its reply brief M & B argues that the district court placed too much emphasis on Saputo's education and experience as a CPA and on Mancuso's business success. It maintains that, regardless of the education or success of a customer in other areas, the customer may be unable to make decisions about market strategy and timing. If this is so, the customer is likely to follow all of the recommendations of the broker, yielding effective control of the account. In support of this position M & B cites *Arceneaux v. Merrill Lynch*, supra. *Arceneaux* is readily distinguishable. That case was tried to a jury, and the jury resolved conflicts in the evidence in favor of the plaintiffs. In the present case the district court made credibility findings in which it rejected Saputo's testimony that he placed complete trust in Dale and simply went along with Dale's recommendations without making any independent inquiry. The district court also rejected Saputo's claim that he was ignorant of the market. The court found incredible Saputo's and Mancuso's claims that they did not know what they were doing.

The district court did not rely unduly on Saputo's education and experience or Mancuso's business success in reaching the conclusions outlined above. Instead, it referred to testimony of the principles on both sides to support its findings. In *Arceneaux* the court did not say that the education and experience of the customer are irrelevant; it merely held that there was sufficient evidence to support a jury finding that a well-educated and experienced customer had placed control of an options trading account in the hands of his broker. This finding was supported by an expert's testimony that the customer was intimidated by the broker and was reluctant to make suggestions or contradict the broker. There is nothing in *Arceneaux* that requires reversal of the judgment in this case, where the district court found, on the basis of a great deal of testimony, that Saputo controlled the account at all times.

### IV.

■ The claim of fraud is based on M & B's contention that Dale misled it by recommending short-term trading purchases based on Merrill Lynch "buy" recommendations issued for intermediate and long-term investment purchases. Saputo testified that when Dale told him a particular stock was recommended for purchase by Merrill Lynch he never discussed "whether it was a purchase for the short-term or the long-term...." Saputo also testified that he and Dale never discussed the difference between trading and investment. The district court found that most of the stocks recommended to M & B by Dale were of good quality. Dale testified that Merrill Lynch's intermediate ratings cover the

short term as well as the intermediate, which is defined as "up to one year."

M & B argues that Dale violated § 10(b) and Rule 10b–5 by failing to inform Saputo that the stocks he recommended for purchase "were not meant to form the basis of short-term trading decisions." Knowing that the pattern of purchasing stocks then being followed by M & B was "more characteristic of a trading account," M & B maintains it was Dale's duty, to explain what " 'intermediate' and 'long term' ... opinions meant." M & B's expert witness testified that stocks recommended in this manner by Merrill Lynch were not suitable for short-term trading accounts.

The parties agree that the elements of a fraud claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 were correctly identified in *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1026 (6th Cir.1979):

> The elements necessary to state a claim for relief will, of course, vary somewhat depending upon which factual pattern is involved. As a general matter, however, private § 10(b)/Rule 10b–5 damage claims can be said to require: 1) the use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale 5) of a security 6) causing 7) damages.

(Footnote omitted). The district court found that the second element was not proved—Merrill Lynch did not employ a deceptive or manipulative device in its dealings with M & B.

M & B relies principally on *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615 (9th Cir.1981), and *Nye v. Blyth Eastman Dillon & Co., Inc.*, 588 F.2d 1189 (8th Cir.1978). Both decisions are readily distinguishable. In *Arrington* the district court found that the broker repeatedly misrepresented material facts to the customers. The broker falsely told the customers that stocks he recommended to them were on Merrill Lynch's "buy" list when they were not so listed. The customers were a retired couple who had sold a small business and invested the proceeds through Merrill Lynch. The district court found that the broker misrepresented the risk of buying on margin in a declining market. *Arrington* did not involve a claim of omission; the district court found that the broker made a number of overt material misrepresentations. The court of appeals determined that these findings were not clearly erroneous, and affirmed a judgment for the customers.

*Nye* bears even less resemblance to the present case. The plaintiffs in *Nye* opened a nondiscretionary account and never authorized the broker to make trades without their approval. The district court found that the broker made serious misrepresentations about his experience and position with the brokerage firm in order to obtain the account. After opening the account the broker violated its conditions by treating it as a discretionary account, making unapproved purchases. In addition, the broker made material misrepresentations about one of the stocks so purchased after the customers learned of the transaction, in order to induce them to hold the stock. The fraud was compounded by the brokerage office manager's confirmation of some of the misrepresentations.

The omissions in *Nye* were of an entirely different order than the alleged omissions in the present case. In *Nye* the broker made unauthorized purchases without obtaining approval of the customers and then failed to inform them promptly. These purchases resulted in losses. Dale made no purchases without prior approval. The district court found that Dale extensively discussed all of the purchases with Saputo and that Saputo understood the basis of the recommendations. In fact, rather than relaying Merrill Lynch's "morning line" to Saputo second-hand, Dale frequently permitted Saputo to listen directly to the Merrill Lynch advisories as they came in from New York.

The strongest similarity between *Nye* and the present case lies in the fact that the customers in both instances were knowledgeable and experienced. The defendants in *Nye* contended that, because of their sophistication, the customers could not have been induced by the proven mis-

representations and omissions to follow the broker's advice. The court of appeals, however, held that customer sophistication is just one of several factors to be considered in determining the reasonableness of reliance on a broker's advice. 588 F.2d at 1197. The district court in the present case did not rely entirely on Saputo's and Mancuso's education, experience and business acumen. These facts were weighed along with a vast amount of evidence that Saputo and Mancuso made independent investigations and realized at all times the nature of M & B's transactions and the risks involved.

This court held in *Securities and Exchange Comm'n v. Washington County Utility District*, 676 F.2d 218, 225 (6th Cir.1982), that an omitted fact is material if there is a "substantial likelihood that a reasonable [investor] would consider it important." (Quoting *T.S.C. Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). The district court found that there were no material nondisclosures by Dale to M & B. This finding was based on testimony that Dale discussed every transaction extensively with Saputo and that Saputo had full access to the research work of Merrill Lynch. It was reasonable to conclude, under these circumstances, that Saputo would not have considered it important that some of Merrill Lynch's "buy" recommendations were for intermediate rather than short-term purchases. The entire record supports the district court's conclusion that M & B's principals understood what they were doing and exercised an informed independent judgment in making the investment decisions on behalf of the company.

▮ M & B also asserts that Dale committed fraud by failing to inform Saputo and Mancuso that he was obligated to follow Merrill Lynch recommendations. M & B argues that it was fraudulent to recommend sales and repurchases of stock that Merrill Lynch continued to recommend as "buys." There is no evidence that Dale breached any Merrill Lynch policy by recommending the sale of stocks that remained on the buy list. The record shows that M & B was playing short swings in a volatile market and that M & B frequently succeeded in taking quick profits in stocks that were still recommended for purchase. Saputo and Macuso were fully aware of this fact and never protested until the market went sour. There is no evidence from which it reasonably could be inferred that M & B would have refused to sell any of the securities merely because they remained on the Merrill Lynch buy list. This argument must fail.

On the entire record we conclude that the findings of the district court are not clearly erroneous. The judgment of the district court is affirmed. The appellees will recover their costs on appeal.

MERRITT, Circuit Judge, concurring.

I concur in the Court's opinion in this case but would add a caveat. The customer's primary argument is based on the fact that the customer and the broker agreed to engage in short term, in-and-out trading and that the record reveals such a pattern. The customer then argues that the broker made frequent "buy" recommendations based on Merrill Lynch's investment recommendation list without explaining that this list did not purport to take into account short term, technical trading considerations. On different facts I would be included to hold this practice to constitute churning. The problem with that argument here is that there is no evidence that Dale, the Merrill Lynch broker, knew any more about short term trading considerations than Saputo, the customer's agent, who authorized each trade. Dale was not guilty of fraud if he did not know that his advice did not adequately take into account relevant short term considerations. He did not engage in churning if he thought, in good faith, that he could make short term recommendations on the basis of long term research. Both Dale and Saputo apparently thought that the Merrill Lynch list could be used for short term trading. The real problem here is that Merrill Lynch management did not go to the trouble to make sure that its brokers fully understood the considerations behind short term trading. One might speculate about the reasons Merrill Lynch did not adopt, and insist that its

brokers follow, different professional standards when they engage in short term trading. The record here is silent on this complex subject, however, and the customer does not appear to argue that Merrill Lynch's management is guilty of fraudulent trading practices when it permits its brokers to engage in short term trading without following the technical considerations that traders normally employ. The case was not tried upon that theory. It was tried on the theory that Dale churned the account, and it seems to me that the Court's opinion correctly decides the lawsuit based on that theory.